## Chicago & N. W. Ry. Co. v. Charles J. Van Every, Adm'r, etc.

1. NEGLIGENCE—*Permitting the Water to Get Too Low in an Engine Boiler.*—Where the cause of an accident, resulting in the death of a locomotive engineer, was his permitting the water to get so low in the boiler of his engine that there was none over a portion of the crown sheet, whereby the sheet, exposed to the intense heat of the fire-box, became softened and gave way, there can be no recovery.

2. VERDICTS—*When Against Established Scientific Facts.*—When a verdict is against established scientific facts courts should have no reluctance in holding it to be lacking the support of a preponderance of the evidence.

**Trespass on the Case.**—Death from alleged negligence. Appeal from the Circuit Court of Cook County; the Hon. RICHARD W. CLIFFORD, Judge, presiding. Heard in this court at the October term, 1901. Reversed and remanded. Opinion filed March 31, 1902. Rehearing denied April 24, 1902.

This suit was brought by appellee to recover damages for the death of appellee's intestate, which, it is alleged, was caused by negligence of appellant, his employer.

Plaintiff's intestate, Herbert C. Van Every, was employed as a locomotive engineer by the appellant, and on the morning of June 28, 1894, had in charge a locomotive of appellant hauling a freight train from Chicago to Harvard, Illinois. Van Every and his fireman, Gemmill, left Chicago with the engine and train about one o'clock in the morning. The train consisted of twenty-two cars, loaded. Just before attaching the engine to the train the water glass in the engine, an instrument used for the purpose of indicating the height of the water in the boiler of the locomotive, was broken. The engineer was supplied with a duplicate glass, and the fireman started to put it into place. While he was working on it Van Every said: "Let it go; we will go to Harvard without one," and proceeded to couple onto the train and started for Harvard. By the breaking of the water glass, the only means left for learning the height of the water in the boiler were what are

called the gauge-cocks, which are three little cocks placed in the back head of the boiler in the cab of the locomotive, one above the other, three inches apart, the lower one being on a level with the line of the lowest part of the crown sheet, which is the sheet over the top of the fire-box. If water came out of these cocks, the engineer by looking could determine that the water arose to the height of the cock tried. If steam came out of one of them he was able to tell by looking that there was no water at the height of the cock tried. There was testimony that an engineer could ascertain whether there was steam or water on trying the cock from the sound made by the escape of the steam or water, and there was also evidence tending to show that it was not safe to rely upon such method of testing the gauge-cocks. The water glass was placed upon the right side of the locomotive with a lamp shining upon it. There was no light by which the engineer could see the result of any tests that he might make of the gauge-cocks unless he took the lantern used for the coal, which was where the engineer could, if he had chosen, have used it to throw light on the gauge-cocks when he tested them.

The train ran to Des Plaines, Ill., about sixteen miles from Chicago, without stopping. There, the locomotive took water, filling the tank. More than half of a tank of water had been used in running from Chicago to Des Plaines. It was dark when they were at Des Plaines, and while the engineer was oiling the engine, the fireman took the lantern and ascertained that water came from each of the three gauge-cocks. He shut off the injector, an appliance used for pumping water from the tank into the boiler, at Des Plaines. The engineer started it again when they had run a short distance. Both before they started from Chicago and at Des Plaines the fireman looked into the fire-box and saw that everything was in good condition, and that there was no leaking. The train proceeded from Des Plaines to Arlington Heights, about ten miles, the fireman putting in coal about every five minutes, and noticing nothing the matter with the fire-box. He heard Van Every, while

going through Arlington Heights, try the gauge-cocks and shut off the injector. The locomotive was set to carry 165 pounds of steam, and was carrying that amount at the time. When about a mile beyond Arlington Heights the fireman had just put in some coal, and as he shut the door he heard a sizzing noise, and as he stepped up on the deck of the engine and stuck his head and shoulders out of the side window of the cab, the furnace door blew open and steam and water came out into the cab. The fireman stood with his limbs near to the door. His clothing was not wet and he was not scalded. Van Every was found along the side of the train on the track, having either fallen or jumped from the locomotive, so badly injured that he died within a few hours. The engine was taken back to the shops of the company at Chicago, and upon examination it was found that what is called the crown sheet or roof of the fire-box had "come down" or bagged inward toward the fire in the front part and center of the sheet, having pulled away from the rivets which supported it from above.

The fire-box of this locomotive was made in the form of a box about twice as long as it was broad, and as high as it was long. It was composed of steel sheets; those on the side being called side sheets, the sheet at the end toward the back being called the back sheet, and the sheet in the front the flue sheet, into which were fastened the long flues or tubes extending forward through the body of the boiler. The top sheet or roof of this box is the crown sheet. This crown sheet was so placed in the boiler that the end where it joined the flue sheet was three inches higher than the end where it joined the back sheet. In other words, the crown sheet sloped from the front of the engine three inches downward and toward the cab. The side sheets were sustained and fastened to the outer sheet of the boiler by what are called stay bolts. In the same manner the back sheet was sustained. Extending transversely across the top of the crown sheet and about two inches or so above the sheet were placed bars called crown bars, with their ends curving over and coming down and resting on the side sheets, where they

were joined and riveted to the crown sheet. Twenty such bars were placed on top of the crown sheet about every four and nine-sixteenths inches. They were sustained by braces attached to the dome of the boiler. These twenty crown bars formed so many arches or bridges extending across the top of the crown sheet. Bolts fastened to these crown bars passed down through the space intervening between the bottom of the crown bar and through the crown sheet, and had their ends beaten up in the form of a rivet head against the lower face of the crown sheet. These rivets were placed every four inches through the crown bar across the crown sheet, and there were twelve to each crown bar, so that the top of the crown sheet was sustained by a rivet running into a crown bar every four inches transversely and every four and nine-sixteenths inches longitudinally. Each rivet had to sustain the downward pressure of the steam upon a surface four by four and nine-sixteenths inches, which at a pressure of 165 pounds to the square inch, was about 3,000 pounds pressure on each rivet.

When the locomotive was brought back to the shops it was examined by experts. They testified at the trial. The result of the examination showed that the crown sheet was bagged down in the shape of a bow, beginning at the first crown bar next to the front or flue sheet, attaining a maximum depression of about five and one-eighth inches at about the eighth crown bar from the front, and becoming straight again at about the fourteenth crown bar from the flue sheet, leaving the sheet straight and undisturbed for the space underneath the six back crown bars. This bagging down of the crown sheet resulted in many of the crown bar rivets pulling off the heads, or, in some cases, cupping and inverting to such an extent that they were pulled up through the rivet holes into the space above the crown sheet. This bagging down of the crown sheet five and one-eighth inches caused a stretching of the sheet to the extent of one and one-half inches in length and about an inch and a quarter in width through the center of the sheet. The rivet heads that were pulled off had their centers pulled out, and were

cupped or inverted, as the witnesses described it, like an umbrella that had been blown inside out by the wind. The rivets themselves, where the heads had thus been pulled off from them, had been stretched or elongated, so that instead of being as they were originally, seven-eighths of an inch in diameter, they were only about five-eighths of an inch in diameter.

Of twelve witnesses who testified on the point, ten stated that the crown sheet, where it had come down the most in the center, was of a bluish black color, shading into a reddish brown at the edges.

Witnesses stated also that extending transversely across the crown sheet between the forward crown bars the sheet was corrugated and sagged down in a wave-like formation between each of these crown bars. The witnesses who examined the fire-box and testified on behalf of appellant, found that the top row of flues, the bottom of which are nearly three inches below the top of the crown sheet at that point, had what is called the beading or turned over and welded edge of the flues, where they are fastened into the flue sheet, so warped that instead of this beading being welded up close to the sheet it extended away from the sheet at least one-sixteenth of an inch, leaving the flues loose in the holes. It also appeared without contradiction that when these flues were removed they were bent and warped so that they had to be straightened, and new ends put upon them. One witness, Sharkey, who examined the fire-box, and testified on behalf of the appellee, testified that he did not notice that the beading on the top row of flues was warped and the flues loose in the holes, as testified to by the other witnesses; but that it might have been possible, notwithstanding his examination, that a knife blade could have been introduced between the sheet and the beading.

The engine was manufactured by the Schenectady Locomotive Works, one of the large locomotive works of the country, in the spring of 1891. The locomotive was at once put into the regular freight service of appellant, and

with the exception of the few times that it went into the shops for ordinary repairs, had continued in that service for about three years at the time of the accident. Van Every, plaintiff's intestate, had been the regular engineer in charge of this engine during the summer and fall of 1893 preceding. In January, 1894, he was sick, and the engine was sent to run between Oshkosh, Appleton, and other points, where it continued in service until about the 11th of June. The men in charge of the engine while there, testified at the trial that they had examined it frequently while in their charge, and that the condition of its flues and crown sheet and crown bar rivets and rivet heads was good. It was brought back to Chicago about June 11th and went into the shops for repairs, and while being so repaired its fire-box was inspected by the foreman in charge of the round-house and boiler-makers under him. The flues were expended, that is, driven in tighter, and the top of the crown sheet thoroughly washed and scraped. After this work was done on the engine the fire-box was thoroughly inspected and tested under both cold water pressure and steam pressure. The engine made three trips between the time it came from the shops on the 21st and the date of the accident on the 28th of June. One of the trips was made with the engine in charge of Van Every, the plaintiff's intestate, and the others by two other engineers; the same fireman, Gemmill, being on the engine in all the cases. These two engineers and the fireman found that the engine did its work properly, and that there was nothing wrong with the fire-box, the crown sheet, flues, or the crown bar rivets. The engineer, Rowe, and the fireman, Gemmill, who brought the engine in a little after seven on the evening of the 27th of June, just before the accident, looked into the fire-box on leaving the engine, and saw that everything about it was apparently in good condition.

On behalf of the appellee and as a ground for recovery against the appellant, the claim was made at the trial that the heads of the crown bar rivets were too thin, and therefore too weak to sustain the pressure of 165 pounds of

steam to the square inch, and that because of such weakness and insufficiency the crown sheet came down.   In support of this contention appellee introduced the testimony of one witness who examined the condition of the locomotive after the accident; and this witness testified that from inspection of one of the crown bar rivet heads, which he found cupped and inverted and which he pulled loose from the rivet shank, the rivet head could not have been much more than three-eighths of an inch in depth or thickness, and that a rivet made of such a depth was insufficient and would cause the coming down of the crown sheet as it did.   He also testified that in his opinion the accident was caused by such insufficiency in thickness of the rivet heads, and was not caused by overheating of the crown sheets due to allowing the water to get too low.   One other expert, a boiler-maker, testified from an inspection of the cupped or inverted rivet head introduced in evidence, that the rivet head, before the inside of it had been drawn out, was too thin, and that the cause of the coming down of the crown sheet should be ascribed to such insufficiency and not to low water, and gave as his opinion from an inspection of this rivet head that it had not been overheated, and that therefore low water did not cause the accident.   One other witness testified on behalf of the appellee—a repairman in the round-house of the appellant.   He testified that the crown-sheet leaked at the rivet-heads when it came in just before the trip upon which the accident occurred; that it leaked at forty places; and that some weeks before the accident he had notified appellant's foreman that the crown-sheet needed repairs.

On behalf of the appellant at the trial it was contended that the accident was caused by the fact that plaintiff's intestate, Van Every, was negligent in running his locomotive without the assistance afforded by the water glass, and that by depending upon the mere sound of the water gauge cocks he had allowed the water to get below the top of the forward part of the crown sheet, and that when the water fell below the top of the crown sheet, it being

subjected to an intense heat, the crown sheet and the crown bar rivet and rivet heads became at once softened, and being subjected to a downward pressure of 165 pounds to the square inch, the rivets were stretched downward and the forward part of the sheet was forced downward until the rivet heads became so soft from the heat that they gave way, the sheet came down and allowed the water and steam to escape into the fire-box and blow open the furnace door, causing Van Every either to jump or fall from the locomotive.   In support of this contention appellant introduced the testimony of eleven witnesses.   These eleven witnesses testified that from their examination of the condition of the fire-box of this locomotive, as they found it after the accident, and from their knowledge of the scientific principles governing the use and working of locomotive boilers, the cause of the coming down of this crown sheet was due to overheating caused by low water, and that it was not due to any insufficiency in the strength or thickness of the crown bar rivet heads.

The issues were submitted to a jury and a verdict was returned for appellee, by which his damages were assessed at $5,000.   From judgment thereon this appeal is prosecuted.

A. W. PULVER, attorney for appellant; LLOYD W. BOWERS and E. E. OSBORN, of counsel.

FRANCIS W. WALKER and ALBERT G. WELCH, attorneys for appellee.

MR. JUSTICE SEARS delivered the opinion of the court.

There is presented upon this appeal but one controlling question, viz.:   Does the evidence sufficiently support the verdict?   And this question is entirely dependent upon the further question as to whether the collapse of the crown sheet of the engine was caused by insecure rivet heads or by low water.   If the cause of the accident was the permitting of the water to get so low in the boiler that there was no water over a portion of the crown sheet, whereby the sheet,

exposed to the intense heat of the fire-box, became softened and gave way, then no recovery could be had. Such an occurrence from such cause could be attributed only to the negligence of the deceased engineer or to that of his fellow-employe, the fireman. If, however, the water did not get low, so as to expose the crown sheet, and the accident was caused by insecure rivets, made insecure and unsafe by repeated hammering in tightening them up, then a recovery might be had under the declaration.

The evidence as to which of these two possible causes did in fact lead to the accident, is not direct evidence, but largely opinion evidence of experts, which is to be considered in connection with certain well known physical and scientific facts. We are of opinion that it can not be said that there was no evidence so far tending to sustain the right of action as to warrant the submission of the issue to the jury. There was evidence which, had it stood alone, would have warranted the jury in returning a verdict for appellee, the plaintiff below. But this conclusion does not relieve us from further consideration of the effect and weight of the evidence. We have the further question to determine, viz., whether the verdict, as returned, is manifestly against the weight of the evidence. In disposing of this question, consideration must be had of the right of the jury to credit or discredit witnesses, and also of the rule of law, well established, that a mere comparison of the number of the witnesses testifying for or against does not of itself afford a rigid criterion for the determining of the preponderance of the evidence. But with all due regard to these considerations, we are of opinion that the verdict in this case is against the clear and manifest preponderance of the evidence, and that it should not be permitted to sustain the judgment. When two witnesses testify to a fact as a matter of opinion, and eleven testify against such fact as a matter of opinion, and the testimony of the two is, by reason of their opportunities for knowledge, and by reason of inconsistency in testimony, not entitled to equal weight to that of the eleven, and when the testimony of the two

is opposed to well known and established physical and scientific facts, it is difficult to see how it can be said that the testimony of the two can constitute a preponderance over that of the many. The only witnesses who testified that, in their opinion, the crown sheet had collapsed, by reason of the insecure rivet heads, were Herron and Sharkey. The former had never seen the crown sheet in question after its collapse, and he based his opinion as to the cause of the collapse solely upon an examination of one of the rivet heads, taken from the crown sheet after the accident, and the rivet head examined by him had been cupped or inverted, that is to say, it had been pulled out of shape, as an umbrella is which is turned wrong side out by the wind. Another witness, Dolan, testified that all the rivet heads by which the crown sheet was held were like the one which Herron examined, and which made the basis of his opinion. Herron's testimony, as an expert, is weakened by his statement that a crown sheet sustained only by such rivet heads could not withstand the pressure of the steam when the engine was carrying more than fifty pounds to the square inch. The evidence is uncontroverted that this engine had sustained the pressure when the engine carried 165 pounds to the square inch for a considerable time preceding the accident. Sharkey had examined the crown sheet after the accident, and he, also, gave as his opinion that insecure rivet heads caused the collapse. But the effect of his testimony is practically destroyed, and he became a supporter of the theory of defense, when he testified that if the top row of flues had their bead turned away and were loose and warped after the accident, then it showed that there was no water on the top of the crown sheet when it collapsed. He testified that he did not find the beading thus turned, but that it may have been possible, notwithstanding what he saw there, that a knife blade could have been put in between the beading and the flue sheet of the top row of flues. Other evidence amply established that the beading upon that row of flues was turned.

Aside from these two experts there was the testimony of

a witness who had been an employe of appellant and had charge of the engines, when they came in, for the purpose of caulking up or tightening the rivet heads.    This witness, Dolan, testified that he tightened up the rivet heads just before the engine went out upon the trip in question, and that they were very light and about forty of them were leaking.    He also testified that he had notified one of appellant's foremen of the condition of the crown sheet some five or six weeks before the accident.    If the preponderance of the evidence could be said to sustain the conclusion that the crown sheet fell because of the giving way of these rivet heads, then the testimony of Dolan would be important, if credited, for it would show notice to appellant of a condition which resulted in the injury.    But if the conclusion that the accident was caused by low water is established by a clear and overwhelming preponderance of the evidence, then it is a matter of no importance that Dolan found the rivet heads light or reported that condition to appellant.    In other words, if the rivet heads did not give way by reason of being too light, and if the accident did occur through another cause, then it does not matter whether Dolan's testimony be credited or not.    It is not argued, and could not well be, that if the water was allowed to get down below a part of the top of the crown sheet, the accident could have been averted by any sort of rivet heads.    There were some grounds for discrediting the testimony of Dolan, but for the reasons indicated we think it unnecessary to consider them.    The great preponderance of the expert testimony and well established physical facts, show that the cause of the accident was low water.

Eleven expert witnesses testified that they had examined the crown sheet after the accident and that in their opinion the cause of its collapse was low water.    Six of these witnesses were not connected with the appellant company and they were, respectively, two of them master mechanics of other railroad companies; two of them proprietors of boiler-making concerns; one a foreman of a boiler-making department, and one a retired boilermaker.    The other five men

were in some manner connected with the appellant company. All of these expert witnesses agree substantially as to the well known indications of a crown sheet collapsed by over-heating, caused by low water. No material inconsistencies appear in their testimony. No one of them was impeached. Their testimony was supported by established scientific or physical facts. There appears no conflict in the testimony that, among the certain indications of an over-heated crown sheet by reason of low water, are a clean bluish color, without soot, on the bottom of the crown sheet where it sagged down; the warping of the beading upon the rows of flues exposed; corrugation of the crown sheet; the cupping or inverting of the rivet heads; and the stretching of the crown sheet. It is practically undisputed that all of these indications were here present.

When a verdict is against established scientific facts, courts should have no reluctance in holding it to be lacking the support of a preponderance of the evidence. Decisions are not wanting where verdicts have been set aside upon precisely the same ground. Of such are Ill. Central R. R. Co. v. Butler, 69 Ill. App. 128, and Hudson v. R. W. & O. Ry. Co., 145 N. Y. 408.

In the former case Mr. Justice Gary, speaking for this court, said, referring to indications similar to those appearing in this case, " The conclusion is irresistible that the crown sheet was not protected by the water." In that case, as here, there was evidence tending to support the plaintiff's theory that insecure rivets caused the crown sheet to give way. But there, as here, the physical facts were positively against such theory.

In the latter case the New York Court said :

" All questions as to the weight of evidence are final in the General Term, and this court has no power to review the determination of that court with reference thereto. But where the evidence which appears to be in conflict is nothing more than a scintilla, or where it is met by well known and recognized scientific facts, about which there is no conflict, this court will still exercise jurisdiction to review and reverse if justice requires."

This court, unlike the New York court, has the power and the duty of passing upon the evidence to determine whether a verdict is against the manifest weight of it.

There is other evidence, which we do not deem it necessary to discuss; evidence of inspection; of use by other employes of appellant of the engine in question; and of tests of the tensile strength of the rivets.   Most of the questions raised upon rulings as to the admission of evidence are such as do not seem likely to arise in the form now presented upon another trial, and therefore it is not necessary to discuss them.

Because the verdict is against the manifest weight of the evidence, the judgment is reversed and the cause is remanded.