CHARLES MORRIS, Plaintiff-Appellee, *v.* GEORGE L. STEWART *et al.*, Defendants-Appellants.

(No. 55053;

First District—March 2, 1972.

Kirkland, Ellis, Hodson, Chaffetz & Masters, of Chicago, for appellants.

William J. Harte, Basil C. Elias, and Thomas P. Donnelly, all of Chicago, for appellee.

Mr. PRESIDING JUSTICE McGLOON delivered the opinion of the court:

This case involves a cause of action for injuries received by the plaintiff in an automobile accident. Plaintiff alleged that the accident was caused by the negligent operation of the defendants' vehicle and instituted suit against the corporate owner of the vehicle and its employee, the driver thereof. A verdict was entered in favor of the plaintiff for $75,000 and judgment entered thereon. After denial of a motion for a new trial, the defendants appeal.

On appeal the issues raised by the defendants are as follows. First, the trial court committed reversible error when it overruled defendants' objection to a hypothetical question posed by plaintiff to plaintiff's expert neurosurgeon. This question did not include what defendants allege was the undisputed fact that plaintiff suffered post-accident falls and head injuries prior to his suffering alleged epileptic blackouts and seizures. Second, defendants contend the trial court erred when it required

them to state their hypothetical question, posed on cross-examination to the same expert neurosurgeon, in terms of alternative fact situations. This action, argue defendants, gave the plaintiff an unfair advantage in that it resulted in their version of the question being once again presented and answered by the witness before the jury. Further, defendants say that this action unduly restricted defendants' rights of cross-examination.

We affirm.

The testimony of the plaintiff can be summarized as follows. On January 13, 1964, plaintiff's car, which he was driving, was struck by a truck owned by the corporate defendant and driven by the individual defendant. The plaintiff's car went out of control and crashed into a streetlight. The impact of the collision caused the plaintiff to strike his head against the roof of his car. Plaintiff was hospitalized that evening under the care of one Dr. Gill and remained in the hospital two or three days. A day or so after leaving, he returned to the same hospital for approximately one week, again under the care of Dr. Gill. Plaintiff said he visited Dr. Gill two or three times a week for the remainder of 1964. As a result of the accident plaintiff suffered, among other ill effects, severe headaches, back trouble, vision difficulty, and said that he had become an epileptic. In relation to his epilepsy plaintiff stated that he had begun to have epileptic seizures about May, 1964, which continued to the present. Plaintiff returned to his job as a truck driver in August, 1964, and worked until March, 1965, when he suffered several seizures at the job and was subsequently discharged by his employer. At the time of trial plaintiff was attending school under a rehabilitation scholarship.

On cross-examination plaintiff reaffirmed that his seizures began in May, 1964. Further, plaintiff said he sustained no head injury from any fall at work and that he never told Dr. Gill he had sustained a head injury in a fall at work but did tell Dr. Gill that he had fallen at work. Plaintiff said he had not had severe headaches prior to the accident.

The testimony of plaintiff's former employment supervisor was that plaintiff had, at the time of the accident, been employed as a truck driver since August, 1961, and was a good employee. The witness said plaintiff was off work from January, 1964, until August, 1964. After his return the plaintiff worked until March, 1965. The plaintiff suffered two falls at work which caused his employers to suspect plaintiff's physical well-being, and he was required to take a physical examination. Plaintiff did not pass this examination, and ultimately, after several doctors examined him, the plaintiff's employment was terminated.

On cross-examination the employment supervisor testified that the plaintiff's falls occurred in the period between August, 1964, and March, 1965. One fall occurred in the trailer of a truck, and plaintiff hurt his

hand. The second fall occurred in the truck yard, and the witness did not state any specific injury resulting therefrom.

Dr. Gill, the plaintiff's treating physician from the time of the auto accident, testified that he had an independent recollection of most of the events involved except for some of the dates and asked to use his records to refresh his recollection. He said he first treated the plaintiff on January 13, 1964, at St. Francis Hospital in Blue Island, Illinois. Among other findings Gill stated he found plaintiff to have pain on motion of the neck or cervical spine and moderate to severe headache and that his diagnosis was a whiplash injury to the cervical spine, cerebral concussion, etc. Plaintiff was only hospitalized for one day initially and re-entered the hospital within several days and stayed for six days. Gill continued to see the plaintiff for the remainder of 1964, and plaintiff complained of headaches and back pains. Gill said that several months after the accident plaintiff began having blackouts and seizures or convulsions with stiffening of the arms and legs and loss of memory. Gill believed these seizures began in March, 1964. Gill said plaintiff had many of these seizures, but that he did not have records theron since plaintiff was very often treated as an out-patient by the emergency room and then released without seeing Gill. Gill saw plaintiff continually from the time of the accident until the present, sometimes twice a week and sometimes once a month. Plaintiff was examined by a Dr. Tobias, a neurosurgeon, during a period of admittance at St. Francis in May, 1965. Gill said that the plaintiff's chief remaining problems from the accident were the headaches, blackouts and seizures. Gill testified that in his opinion there was a causal connection between the accident and the plaintiff's present condition of seizures and that such condition was probably permanent.

On cross-examination Dr. Gill testified that although plaintiff complained of headaches on January 13, 1964, the summary sheet of his hospital admission on that day contained a patient history taken by Dr. Gill, and this history contained no mention of headaches. Gill further stated that plaintiff was hospitalized in March, 1964, allegedly for blackouts and seizures but that the diagnosis on the discharge sheet for that hospitalization contained no reference to seizures. Gill said that although they didn't specifically hospitalize plaintiff for seizures, they were still evaluating these complaints. A patient history taken from plaintiff by a resident doctor during the March, 1964, hospitalization indicated a history of headaches going back several years prior to the accident. Gill stated that plaintiff's seizures began in March, 1964, as indicated by his records but that the records themselves used terminology of vision focusing difficulty, nervousness, severe headaches, and no specific terminology

of seizure was indicated. Gill said he thought plaintiff's first encephalogram was in March, 1964, but admitted the first record of plaintiff receiving an encephalogram was March, 1965. The first note Gill had in his office records of plaintiff having seizures was January, 1965, wherein plaintiff complained of memory loss, confusion and loss of contact, although Gill said his records did not actually contain the term "loss of contact." Plaintiff was hospitalized in May, 1965, at which time Dr. Tobias examined him. A patient history taken by Dr. Gill at the May, 1965, hospitalization was as follows:

"A twenty-five year old white male with history of automobile accident and head injury one year ago; did fairly well until three months ago when fell at work again; since then has had episodes of blackout spells and seizures; has been on Dilantin and phenobarbital; this P.M. evidently had a seizure and fell down a flight of stairs."

Gill stated that when plaintiff talked to him in May, 1965, he told Gill that he had fallen and received a head injury. Gill maintained that plaintiff had seizures prior to 1965 even though he had no notes thereon, and such symptoms as vision change and loss of memory were part of a whole picture. Gill stated that a visual disturbance is related to a blackout or seizure in that it is a different focus of irritability but can arise out of the same pathology. He stated that the later falls could have aggravated a preexisting pathology but didn't feel they were of such a severity to give him the amount of symptomatology plaintff had. Although he had no records indicating convulsions prior to 1965, Gill insisted plaintiff did have blackouts and visual disturbances in 1964. He said he felt certain there was a history of seizures prior to plaintiff's hospitalization in May, 1965. Plaintiff's encephalogram in March, 1965, was within normal limits.

Dr. Tobias, a neurosurgeon, was called by plaintiff as an expert witness in the field of neurosurgery. He testified that he examined plaintiff in May, 1965. He was asked the following hypothetical question by the plaintiff:

"Q. * * * Assuming a man twenty-five years in good health had been employed for, approximately, four years as a truck driver, who on January 13th, 1964, was involved in an accident where he was driving an automobile, the automobile left the road and struck a light pole as a consequence of which he struck his head against the side of the window of the car, was hurled to the floor, subsequently left the car, was violently ill, was hospitalized the following day for two days complaining of severe headaches, neck and back injuries, left the hospital, returned, and stayed six days with the same injury, subsequently ·returned to work, still sustaining

severe headaches that he ultimately recovered from his neck and back injuries, continued to have severe headaches, and, then, began to have black-outs seizures after the accident, is to this day having black-outs seizures, has had, approximately, thirty-five to forty seizures in this period of time, that he never had these symptoms prior to this accident, Doctor, assuming these facts to be true, do you have an opinion based on a reasonable degree of medical certainty from a medical and surgical standpoint as to whether or not there might be a causal connection between the accident I have described and the condition of ill-being related in the future as set forth in the question?"

Counsel for defendants objected to the question on the ground that it did not include reference to the alleged head injury sustained in the fall some three months prior to May, 1965. After a discussion in the trial judge's chambers, the objection was overruled, and Dr. Tobias was permitted to express his opinion which was to the effect that, under the facts of the hypothetical, there would be a causal relationship between the accident and the plaintiff's present condition of ill-being.

On cross-examination counsel for defendants asked Dr. Tobias a hypothetical question with the following facts:

Q. "Doctor, in connection with the same hypothetical question that was asked of you, substituting the following facts, or adding the following facts, that a twenty-five year old male, who has had complaints of headaches for many years, was in an automobile accident on January 13th, 1964, wherein he sustained an injury to his neck, lower back, on the day of the accident, when he was examined by a physician had no complaints of headache, thereafter, a week or ten days later, who says he did have complaints of headaches, and when examined in May, of 1965, sixteen months after this particular occurrence of January, 1964, gives a history of having fallen at work &ast; &ast; &ast;."

The plaintiff's counsel objected at this point; and after a discussion, the defendants' counsel continued as follows:

Q. "We have a hospitalization, Doctor, in May, 1965, in which the hypothetical person has given a history of having fallen at work three months before hitting his head, since then black-outs spells and convulsions have resulted.

Do you feel, Doctor, that your opinion as to the relationship to the very condition back to 1964, would change in any way by the conditions of those facts?

A. Yes.

Q. In what way would they change?

A. You see, we are not dealing with facts here. We are dealing with interpretations of symptoms, and, certainly, there are various possibilities. The first possibility is that the head injury would have been mild, more mild than was noted.

On the other hand, he may have come into the hospital in a dazed state and unable to give adequate history. It is very common or basis of a head injury, not able, their mind is not clear and they are not able to say everything that happened to them, and this retrograde is quite common in the head injury. [*sic*]

The second point is, that the fall at work either preceeded the convulsions or the convulsions accompanied the fall. It is very difficult what came first, either the chicken or the egg.

During the convulsion, a person will fall down. Did he fall down first and strike his head, or, did he strike his head first, and, then, get the convulsions. I don't know, I can't answer that.

Q. Doctor, if the facts as gathered in the hypothetical question, the convulsions and blackout spells occurred since a fall in which a head injury was sustained * * *."

At this point plaintiff's counsel again insisted that the testimony about seizures occurring in 1964 had to be included in the question. After further discussion and a recess, the defendants' counsel resumed as follows:

Q. "Doctor, we have been talking about a hypothetical man who, on January 13th, 1964, was involved in an automobile accident, who on that particular day was examined for neck and back injuries, received treatment for the neck and back injuries and without complaining of headaches, and, thereafter within five or six days received additional treatment for those two injuries, in addition to what he did make a complaint of headaches, that in March, 1964, he was hospitalized again with a diagnosis of whiplash injury of the cervical spine and the contusions of the lumbar spine, and, at that time, he had given a history of having headaches for many years, and that thereafter he continued to be under the treatment of a physician, that thereafter the hypothetical man stated that he told his treating physician that he had seizures and black-out spells, that the doctor, the treating physician has no notes, records, or notations of any complaints of black-out spells, or seizures until March of 1965, that on a hospitalization in May, 1965, he gave a history of a fall in which he sustained a head injury, and that thereafter since that time he has had convulsions and seizures, would those additional facts affect or vary the opinion as to the

conclusion between the diagnosed condition and the accident of January, 1964?

THE COURT: I am afraid we are putting the doctor in a position of selecting which of the two versions is correct here. Suppose we have him answer it both ways.

MR. DUFFY: Q. First of all, Doctor  *  *  *.

THE WITNESS: —I assume the man had these seizures and black out spells March, 1964, which would be before the fall?

MR. DONNELLY: Yes.

MR. DUFFY: Yes, before.

THE COURT: Ask the doctor if he can, please, answer the question on that basis, and, then, follow this. Let's assume he did not have these seizures before 1965, because, otherwise, you put him in a position of prior to the affect  *  *  *.

MR. DUFFY: Q.  *  *  *  —Can you answer that question both ways?

THE WITNESS: Yes, I will try.

Naturally, it makes a tremendous difference. If the house falls down by itself, or, if a house falls down with an earthquake, we have to assume the earthquake made the house fall down  *  *  *."

The witness concluded his testimony stating a head injury as such was not a necessary prerequisite to the occurrence of epilepsy and that the fact that plaintiff's two encephalograms indicated normal was, in his opinion, not overly significant in determining whether or not epilepsy was present.

As previously noted, verdict and judgment were for the plaintiff in the amount of $75,000.

■■ On appeal, the first issue raised by the defendants is that the trial court erred in overruling their objection to the hypothetical question posed by plaintiff to Dr. Tobias, as previously set out. Defendants claim that the hypothetical had to contain all undisputed matters of fact, and they argue that it was undisputed that the plaintiff's seizures and black-outs began after he suffered a fall and head injury while at work sometime around March, 1965. In support of this argument defendants point to the patient history taken by Dr. Gill from the plaintiff in May, 1965. This statement, which we previously quoted, stated the plaintiff's seizures began after a fall at work suffered around March, 1965. This hospital record coupled with other so-called "admissions" by Gill that he had no records in which the express terms "blackouts" or "seizures" were used prior to March, 1965, prompts defendants to urge that in effect Dr. Gill has completely changed his testimony so as to make it undisputed that

plaintiff's seizures began after a head injury suffered about March, 1965. Since this allegedly critical, undisputed time element of when the seizures began was left out of the plaintiff's hypothetical, defendants argue that their objection to this omission was erroneously overruled. Further, defendants argue that although the law permits parties to form hypothetical questions using their own version of disputed facts, providing there is evidence to support that version, no such dispute exists in this case. This is so, defendants argue, because it was the testimony of the plaintiff's own witness that created a "dispute." To allow such a situation to come within the aforementioned rule would be, say the defendants, to allow plaintiff to create his own disputes in order to propound the more favorable facts hypothetically.

Plaintiff's response to the initial issue raised by the defendants is as follows. First, there is, in plaintiff's words, an "overwhelming weight of evidence" as to blackouts, seizures and related symptomatology occurring prior to any alleged post-accident head injuries. This evidence stems from the testimony of both the plaintiff and Dr. Gill. As a result plaintiff argues that there is a dispute in the record. Plaintiff urges the rule that any contrary evidence, regardless of its weight, is sufficient to create a disputed fact. Therefore, plaintiff argues that the trial court was correct in allowing his hypothetical to be posed without the alleged fact of a post-accident head injury followed by seizures. Second, plaintiff argues that his testimony as well as the entire record discloses the existence of a factual question as to whether there even was a "head injury" which intervened between the car accident and the beginning of plaintiff's seizures. Plaintiff notes that the hospital record of May, 1965, strongly relied on by defendant to establish the beginning point of plaintiff's seizures, says nothing about a head injury. That point only came up in the oral testimony of Dr. Gill concerning this record. Plaintiff also notes that no other testimony regarding plaintiff's falls at work speaks of a head injury occurring.

With regard to the first issue raised by defendant, we cannot agree with his position. Even were we to accept the defendant's argument, and we do not, that Dr. Gill so changed his testimony on cross-examination such that the net result thereof was an unequivocal statement that the plaintiff's seizures began after a head injury suffered at work in March, 1965, we still cannot say there was no dispute in the evidence. To do so would be to ignore the testimony of the plaintiff wherein he expressly said he began suffering blackouts and seizures "about March, 1964." Plaintiff also testified that although he experienced a fall after returning to work he suffered no head injury therein.

In *Catlin v. The Traders Insurance Co.* (1898), 83 Ill.App. 40, the court said that where there is any evidence tending to establish a fact, a party has a right to base its hypothetical question upon that evidence regardless of the preponderance of the evidence on that subject. In *Chicago and Eastern Illinois Railroad Co. v. Wallace* (1903), 202 Ill. 129, 66 N.E. 1096, the Supreme Court said at page 133:

"It seems to be now generally settled by the great weight of authority, that a hypothetical question, addressed to an expert witness, is not improper, simply because it includes only a part of the facts in evidence, provided the testimony tends to establish such facts as are embodied in the question. (Rogers on Expert Testimony, 2d ed., par. 27.) This precise point has been decided by the court in *Howard v. People*, 185 Ill. 552, where we said (p. 560): 'There was evidence tending to prove each of the facts stated in the hypothetical questions upon which the opinions of witnesses were asked and that was all that was necessary.' (Thompson on Trials, par. 604, *et seq.*) Whether the facts, stated in a hypothetical question, are sufficiently established by the proof is to be decided by the jury. 'The fact, that a question is a hypothetical one, implies that the truth of some statement of facts is assumed for a particular purpose, and, if such a question could be based upon undisputed facts alone, it would never be asked in any case where an issue of fact arose.'" (Underhill on Evidence, p. 272.)

Thus, even accepting defendants' argument concerning a change in the testimony of Dr. Gill, we think there was still a dispute sufficient to allow plaintiff to pose a hypothetical using that version of the facts for which he had introduced some evidence in support thereof, and then leave it to the jury to determine whether or not those facts were proved. We find no cause for alarm in defendants' argument that to allow contraditions among a party's own witnesses to be regarded as a "dispute" will result in contrived contradictions by parties to enable them to propound the more favorable contradicted facts in their hypotheticals. We think such conduct contains its own deterrent in that whatever advantage is secured thereby is offset by the prospect of the effect on the jury of hearing witnesses for the same side contradict each other's facts.

Even when viewing the issue from the opposite perspective, we cannot agree with the defendants. This is so because we cannot accept the defendants' argument that on cross-examination Dr. Gill completely changed his testimony. The gist of the defendants' argument on this point seems to be that Gill's oral testimony was completely contradicted by the official hospital reports and, therefore, the version of the facts as given by these reports is controlling. However, the record reveals that

the hospital report made in 1965 stating that plaintiff's seizures began after a fall at work around March, 1965, makes no mention of any head injury. That report only stated that the plaintiff fell at work. It was the subsequent oral statement of Dr. Gill that added mention of a head injury in connection with the reported fall. It is clear that in referring to Gill's oral testimony, we must refer to it in its entirety. Such reference reveals that, throughout his cross-examination, Dr. Gill continued to insist that the plaintiff's seizures began in 1964.

■■ We think that rather than effecting a complete change in Gill's testimony, the most defendants achieved was to raise a question as to the witness's credibility. Thus, at the close of all the evidence, there stood the uncontradicted testimony of the plaintiff that he had seizures in 1964 and the testimony of Dr. Gill corroborating the plaintiff's testimony albeit his credibility had been impeached on cross-examination. Add to this situation the fact that the defendants introduced no medical testimony on their behalf on the causation question, and we think it can be said that the net result is that it is the plaintiff's version of the facts which was undisputed. As such, the plaintiff's posing of his hypothetical question in a context of these facts was proper.

The second issue raised by the defendants is that the trial court erred in requiring defendants to state their hypothetical question in terms of alternative factual situations. The defendant argues that the action of the trial court in requiring alternate fact inclusions in their hypothetical question which we earlier quoted to Dr. Tobias resulted in a restriction on their right of cross-examination and secured an unfair advantage to the plaintiff in that it once again presented his theory of the facts on causation to the jury.

■■ We do not agree with the defendants' argument on this issue for several reasons. To begin with, we note that at the time of this action by the trial court, there was no objection raised by the defendants. Rather they indicated a willing acquiescence to have their question answered alternatively. Such failure to object forecloses any present allegation of error. (*Haymes v. Catholic Bishop of Chicago* (1969), 41 Ill.2d 336, 243 N.E.2d 203.) Further, a reading of that portion of the record which we earlier set out relating to this action by the trial court indicates that just prior to that statement of the hypothetical question which prompted the suggestion of alternate fact inclusions, the defendants opened their cross-examination by posing an initial phrasing of the question which, in spite of the interruption of an objection and its resultant discussion, contained only the defendants' version of the facts as to the seizures. This question was answered by Dr. Tobias who said that these facts would change his opinion as to causation.

In short, we feel the defendants' theory of the case was adequately exposed to the jury and that the trial court was well within its discretion in controlling the questioning as it did.

Judgment affirmed.

DEMPSEY and McNAMARA, JJ., concur.