JOHN KINCL, Ex'r of the Estate of Louis Kincl, Deceased, Plaintiff-Appellee and Cross-Appellant, *v.* HYCEL, INC., Defendant-Appellant.—(THE EDWARD HOSPITAL DISTRICT *et al.*, Defendants-Cross-Appellees.)

First District (5th Division)    No. 60717

Opinion filed December 30, 1977.

Howard & French, of Chicago (Richard French and Stuart N. Litwin, of counsel), for appellant.

Albert F. Hofeld, Ltd., of Chicago (William J. Harte, Ltd., of counsel), for appellee.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (D. Kendall Griffith and Dennis J. Horan, of counsel), for cross-appellees Edward Hospital District and Alfred R. Olley.

William D. Maddux, Ltd., of Chicago (William D. Maddux and Jerald A. Kessler, of counsel), for cross-appellees James V. Dunphy and Felipe Serna.

Pretzel, Stouffer, Nolan & Rooney, Chartered, of Chicago (Joseph B. Lederleitner, of counsel), for cross-appellee George G. Markarian.

Mr. JUSTICE WILSON delivered the opinion of the court:

An action was brought by plaintiff, John Kincl, the executor of the estate of Louis Kincl, deceased, against Hycel, Inc. (Hycel), the Edward Hospital District, Alfred R. Olley and three doctors: Felipe Serna, James V. Dunphy, and George G. Markarian. In his suit, plaintiff sought damages for personal injuries which eventually caused Louis Kincl's death allegedly resulting from the negligence of defendants. The jury returned a verdict of $750,000 against Hycel; verdicts were returned in favor of the other defendants. Judgment on the verdict was entered by the court. Hycel appeals from the judgment in favor of plaintiff, alleging numerous trial errors which raise issues regarding evidentiary and procedural matters; the propriety of plaintiff's closing argument; the manifest weight of the evidence; whether the chain of causation was broken by negligence

constituting an intervening cause; whether the damages are excessive. In his cross-appeal, plaintiff contends that the verdicts in favor of the defendants are against the manifest weight of the evidence and that the cause should be remanded for a new trial. We affirm.

The facts sufficient to support our conclusions are presented in our discussion of the various issues and follow below.

On January 24, 1968, Louis Kincl was brought to the emergency room of Edward Hospital, after he had fallen from a ladder. X rays revealed that Kincl had several fractured ribs and a fractured pelvis, but he had no head injuries. Dr. Markarian, an orthopedic specialist, treated the fractured pelvis by putting Kincl in traction. Dr. Nigro treated the fractured ribs. Kincl's condition began to improve. On January 27, however, Kincl's temperature rose and he began to exhibit symptoms of a fat embolism which is not uncommon following a fracture. As a result, Dr. Markarian treated Kincl with Dextran, a blood plasma expander.

Kincl's condition steadily improved, and on the morning of January 31, Dr. Markarian discontinued the Dextran treatment. On January 30, Dr. Dunphy, a specialist in internal medicine, saw Kincl. His study of Kincl's records indicated that the patient was properly recovering from the fat embolism and that nothing specific was wrong. Kincl was alert and talkative. However, Dr. Dunphy ordered a blood sugar test. Alfred Olley, a hospital laboratory technician, performed the test on the morning of January 31; he employed a Hycel P.M.S. blood glucose test, a product of defendant Hycel. This test gave a reading of 2000 milligrams, which indicated an abnormally high concentration of glucose in Kincl's blood. Olley testified that a reading of 65 to 110 milligrams is normal. Furthermore, Dr. Dunphy testified that the highest reading that he had ever seen was less than 1000.

Olley did not check to determine if Kincl was receiving a substance which would interfere with the blood sugar test. The laboratory chart did not indicate whether an intravenous solution had been given to Kincl. In fact, Dextran had been given intravenously.

It was later determined that Dextran interference caused the inaccurate reading of 2000, because the Dextran drug appears as sugar in the Hycel test due to Hycel's use of sulphuric acid in its method. Sulphuric acid breaks down the Dextran molecules into sugars which interfere with the Hycel test readings.

In accordance with the standard procedure for grossly abnormal test results, Olley brought the inaccurate reading of 2000 to Dr. Felipe Serna, the pathologist and director of the hospital laboratory. Dr. Serna testified that he knew that there could be interferences with various types of tests; therefore, abnormal results were reported to him, so that he could determine why an abnormal result had been reached. He asked Olley to

repeat the test. After Olley repeated the test and reached the same inaccurate result, Dr. Serna ordered him to report the results to the floor where Kincl was being treated. Dr. Serna had not contacted Kincl's attending physician or checked an urinalysis dealing with sugar.

On the morning of January 31, the results of the blood sugar test were reported to Dr. Dunphy. He testified that when he ordered the blood sugar tests, he did not suspect that Kincl was diabetic. At a later time, an autopsy of Kincl indicated that he had never had a diabetic condition in his pancreas. Indeed, Kincl had no personal or family history of diabetes. Tests showed that there was no sugar in Kincl's urine. He further testified that it was possible that kidney damage prevented sugar from getting into the urine; Kincl had a damaged kidney as he had protein in the urine. Without consulting with the laboratory on the issue of whether the Hycel test was reliable, Dr. Dunphy ordered an injection of 20 units of insulin for Kincl. Dr. Frederick Andrew Gibbs, a neurologist called by plaintiff, testified that an injection of insulin is the standard treatment for the kind of diabetes involving a lack of natural insulin to control sugar.

At 11:20 a.m. on January 31, the 20 units of insulin were given to Kincl. As Dr. Dunphy had requested, another blood sugar test was performed, and the Hycel method produced a result of 1580. At 2:45 p.m., on Dr. Dunphy's order, Kincl was given 50 units of insulin. Dr. Markarian testified that according to a nurse's chart, Kincl had a "ringing in his ears" at approximately 3 p.m. In addition, at approximately 4 p.m., Kincl was sweating profusely; at 4:45 p.m., he was "very drowsy." A blood sugar test, at about 5 p.m., produced a reading of 1620. At 5:30 p.m., Dr. Dunphy ordered another 20 units of insulin. He testified that according to the nurse's notes, Kincl was sweating profusely and drowsy from 8 p.m. to 10 p.m. A blood sugar test, at 8:30 p.m., gave a reading of 1580. Dr. Dunphy testified that by 9:30, he had reviewed some of the literature on diabetes and had decided that the insulin dosage was inadequate for the high blood sugar level. Thus, he ordered 100 units at 9:30 p.m. Also, he testified that the nurse's notes at 11 p.m. revealed that Kincl had gone into a deep sleep and was sweating.

On January 31, at 10:45 p.m., Marion Mirovsky, a private duty nurse hired by plaintiff to stay with the patient during nighttime, came on duty. Mirovsky testified that on the night of January 30, Kincl's condition seemed to be improving. When she came to work on January 31, she was shocked by a major change in Kincl's appearance. Mirovsky further testified that Kincl was sweating profusely in a deep sleep. Later, he had an irregular pulse and irregular respiration. Mirovsky testified that "he had no rectal temperature at all, it didn't register as 94 on the thermometer," and she thought Kincl was dying. Between midnight and 1 a.m., Kincl appeared to be in great pain. He was thrashing and attempting

to get out of bed. Mirovsky also testified that it took six people to restrain Kincl who then fell into a very deep sleep from which he could not be aroused.

Around midnight, Mirovsky called Dr. Dunphy to warn him of Kincl's condition and to ask him to come to the hospital to check Kincl. Mirovsky testified that Dr. Dunphy then refused to come to the hospital. She notified him of a blood sugar reading of 1400 which was produced by a test at midnight. On Dr. Dunphy's orders, 50 units of insulin were administered to Kincl at midnight. In the telephone conversation, Dr. Dunphy told Mirovsky to call Dr. Markarian. When she called him, Dr. Markarian asked her to keep him informed and between 1 a.m. and 2 a.m., in response to a second call by Mirovsky, Dr. Markarian came to the hospital. When Dr. Markarian examined the patient, he was in a coma with perspiration, tremors, and no response to external stimuli. Dr. Markarian testified that he called Dr. Dunphy and told him that the diagnosis was possible hypoglycemia. He further testified that insulin given in large quantities can drive the blood sugar of a person down to where he has too little sugar in the blood. After the doctors finished their phone conversation, a 2½ intravenous sugar solution was given to Kincl and Dr. Markarian stayed with Kincl for approximately 30 minutes. Both Mirovsky and Dr. Markarian testified that Kincl's condition then began to improve.

In accordance with Dr. Dunphy's orders, Mirovsky gave 50 units of insulin to Kincl at 4 a.m. on February 1. According to Dr. Markarian's testimony evaluating a nurse's chart, at 4 a.m. Kincl had tremors of the extremities and heavy perspiration.

At 6:30 a.m., Dr. Dunphy came to the hospital. Mirovsky testified that he repeatedly asked her if she was certain that there was no sugar in Kincl's urine. Mirovsky assured Dr. Dunphy that the test showing no sugar in the urine was accurate. In addition, she testified that when she went off duty at 7 a.m., Kincl had convulsive tremors of the extremities, profuse sweating, low blood pressure, and a weak, irregular pulse. He was in a deep sleep.

Sometime on the morning of February 1, Olley took a blood sugar test which gave a result of 1040. Olley testified that when he brought this result to Dr. Serna, Olley found Dr. Nigro discussing with Dr. Serna the possibility of there being an interference involved in Kincl's blood sugar tests. Dr. Serna told Olley to test Kincl's blood by a different method. Olley testified that he assumed that the 1040 reading was reported to the floor. At 11 a.m., on Dr. Dunphy's orders, 100 units of insulin were administered to Kincl. Later in the day, Olley ran a blood sugar test on Kincl's blood using a method (ortho-toluidine) which was different from the Hycel method; at 1 p.m., he obtained a low reading of 24. Olley

testified that Dr. Nigro suggested using the Hycel method to test the intravenous solution of Dextran which Kincl had received. The Hycel test gave a very high reading, and the other test gave a very low reading. Olley then called the technical service division of Hycel in Houston, Texas. In addition, Olley testified that, over the phone, a Hycel representative told him that Dextran in the patient would interfere with the Hycel test and produce falsely elevated readings. The Hycel representative told Olley to look at page 5 of his manual, which lists sources of error, for an explanation of the interference. When Olley said that there was no reference to the problem on page 5, the Hycel representative surmised that Olley had an old manual. Olley asked for a new manual, which he received a few days later. John Moran, chairman of the board of Hycel, testified that a revision of the old manual had been printed in April or May of 1966. The revised manual gave a warning about the problem of blood sugar readings being falsely elevated.

When it became clear that Kincl's blood was not extremely high in sugar, the treatment for Kincl was altered. However, he was semi-comatose and helpless for the remainder of his life. Dr. Dunphy testified that in retrospect, it is a good possibility that Kincl went into a coma because of excess insulin, which deprived the brain of glucose. Brain damage resulted from the excessive insulin. On April 11, 1969, Kincl was discharged from Edward Hospital and placed under the care of plaintiff John Kincl, his brother. At LaGrange Hospital, on July 15, 1970, Louis Kincl died of penumonia.

OPINION

■■ ■ According to the jury instructions, plaintiff set forth three separate bases for his negligence action against defendant Hycel: (1) that Hycel failed to give any warning of the false elevation problem to Edward Hospital's personnel or the defendant physicians; (2) that if it gave a warning, the warning was not proper, adequate or timely; (3) that a purported warning on the label of bottles of Hycel sugar test reagent was inadequate. Hycel contends that the jury verdict in favor of plaintiff was against the manifest weight of the evidence. We disagree with Hycel's contention. For the jury verdict to be against the manifest weight of the evidence, it must appear that when viewing all the evidence in a light most favorable to the opponent, conclusions reached by the jury are palpably erroneous and wholly unwarranted. (*Harris v. City of Granite City* (1977), 52 Ill. App. 3d 782, 365 N.E.2d 1034.) On the contrary, there was sufficient evidence for the jury to conclude that Hycel had failed to give any warning of the false elevation problem to Edward Hospital's personnel or the defendant physicians.

The following evidence supported plaintiff in his action against

defendant Hycel. Olley, the lab technician who performed Hycel P.M.S. blood sugar tests, testified that when he unpacked the bottles of Hycel reagent, he saw no warning of any kind in the packages in which the bottles came nor on any bottle itself. When he looked at the label on the bottle of Hycel reagent used to test Kincl's blood, he saw no warning concerning an interference. Defendant Serna testified that on February 1, 1968, he first became aware of the false elevation problem; he had never received any information from Hycel regarding the problem. Neil Mason, a salesman for Scientific Products, defendant Hycel's distributor, who sold the reagent to Edward Hospital, testified that he had seen warning labels on the bottles of reagent. However, he was impeached by deposition testimony in which he admitted having never seen a warning of false elevation on any Hycel P.M.S. reagent bottle. Dr. Cyril Wecht, a pathologist and medical laboratory director called by plaintiff, testified that until the instant case came to his attention, he was not aware of an interference with the Hycel test. In addition, Dr. Robert W. Alexander, a pathologist and medical laboratory director called by defendants Dunphy and Serna, testified that in 1968, the existence of the interference problem was not commonly known by pathologists or the College of American Pathologists.

John Moran testified that a new bottle of Hycel reagent can be used up to two years after its manufacture. He further testified that warning notices were not employed until the middle of 1966. Raymond Inman, a technical service manager for Scientific Products, testified that he had no knowledge of Hycel ever requesting a relabeling of its products in Scientific Products' warehouse. Moran testified that at the time the revised bottle labels giving a warning were printed, a 30-day inventory of Hycel reagent was in the hands of distributors; none of the inventory was ever recalled to be affixed with revised labels. From this evidence, the jury might have determined that Hycel did not warn of the interference problem since a bottle of reagent manufactured in early 1966 would not carry a warning of the problem, and yet the reagent would be appropriate for use at Edward Hospital on February 1, 1968. Apparently, the original manual distributed by Hycel did not contain a warning as to the problem. According to Olley's testimony, Edward Hospital did not receive from Hycel a revised manual, which gave a warning, until after the test readings for Kincl's blood had been falsely elevated and insulin had been given. Olley also testified that he never received "Hycel News Information," a monthly newsletter issued by Hycel.

The following evidence supported defendant Hycel. Moran testified that June 1966, October 1966, and August 1967 issues of the newsletter warned of the Dextran interference problem. Newsletters were distributed through a mailing list which included Edward Hospital. Olley testified that when he unpacked shipments of materials arriving at the

Edward Hospital laboratory, he would not necessarily look at any technical information that might be included in a container. Plaintiff took an evidence deposition of Albert Long, a licensed laboratory director in Florida. Long testified that Monroe Hospital, where he had been a laboratory technician, began receiving warning notices in the Hycel packaging in 1966. Also, Moran testified that, based on Hycel records, 2000 of these notices were printed in July 1966. Thereafter, 1500 were printed in December 1966, another 5000 in June 1967, and 15,000 in July 1967. These notices were placed inside a plastic bag in which the bottle of Hycel reagent was contained. Joanne Murphy, a technical representative for Hycel in the district including Edward Hospital from 1967 to 1972, testified that she saw warning notices in the plastic bags.

■■ As the record revealed, both plaintiff and defendant Hycel have evidence tending to support their own versions of the case. Since there is evidence which, if believed, supports the verdict in favor of plaintiff, we will not interfere with the result. (*Nowakowski v. Hoppe Tire Co.* (1976), 39 Ill. App. 3d 155, 349 N.E.2d 578.) It is for the jury alone to determine the credibility of the witnesses and the weight of the evidence on disputed questions of fact. (*O'Reilly v. Fencel* (1976), 38 Ill. App. 3d 499, 348 N.E.2d 251.) A verdict should not be disturbed on review merely because the jury could have drawn different inferences from the evidence. (*O'Reilly.*) Indeed, questions of negligence are ordinarily questions of fact for a jury, a fact-finding body, to decide. (*Ney v. Yellow Cab Co.* (1954), 2 Ill. 2d 74, 117 N.E.2d 74.) In passing on the manifest weight of the evidence, we considered the fact that the trial judge, who observed the demeanor of the witnesses, listened to their testimony, and heard the arguments of counsel, denied defendant Hycel's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. See *Mayer Paving & Asphalt Co. v. Carl A. Morse, Inc.* (1977), 48 Ill. App. 3d 73, 365 N.E.2d 360; *Costello v. Chicago Transit Authority* (1976), 40 Ill. App. 3d 461, 352 N.E.2d 417.

We now turn to the cross-appeal. It raises the issue of whether the verdicts in favor of defendants Dunphy, Markarian, Serna, Olley, and the Edward Hospital District are against the manifest weight of the evidence. We believe that ample evidence was presented to support the jury's verdicts. As previously mentioned, it is not our function to weigh the evidence or determine the credibility of the witnesses. *O'Reilly.*

The jury instructions gave a twofold theory of liability against Dr. Dunphy: (1) he was negligent because he failed to recognize and investigate the false blood sugar readings and administered insulin; and (2) he failed to properly monitor Kincl. The following evidence supported Dr. Dunphy. He testified that when he received the test result showing a blood sugar level of 2000 milligrams percent, he considered the situation to be an emergency. Dr. Dunphy felt that a person with such a

high level of sugar had a 50 percent chance of dying. Immediately, Dr. Dunphy considered the possibility that the test was wrong. He further testified that he dismissed this consideration because he regarded the blood sugar test as one of the basic tests which can be performed well by even a poor laboratory, and Edward Hospital had a very good laboratory. Dr. Wecht testified that doctors have a right to rely on blood sugar test results. He also testified that very high blood sugar readings do in fact occur, and he knew of a reading of 4800 milligrams. Dr. Alexander testified that such readings occur. Also, the jury heard Olley testify that he had twice encountered blood sugars as high as those of Kincl.

Dr. Dunphy testified that he had seen people with blood sugars as high as 470 with no sugar in the urine, but sugar normally appears in the urine when the blood sugar exceeds 170. Furthermore, according to the testimony of Dr. Wecht, there is a great deal of variation from person to person as to what level the blood sugar must reach before sugar appears in the urine. Dr. Dunphy reasoned that the absence of sugar in the urine might have resulted from damage to Kincl's kidneys. Indeed, Dr. Dunphy ordered the urine tests repeated and performed with different methods. He testified that the lab tests indicating protein in the urine corroborated his theory of kidney damage. Dr. Shelton Berger, an internist called by defendant Hycel, testified that there can be a high blood sugar and no sugar in the urine. Also, he testified that a fall, such as Kincl sustained, could "unmask diabetes."

Dr. Wecht testified that there were cases of persons with very high blood sugar levels who were "alert and not apparently ill." Concerning the reading of 2000, on cross-examination by counsel for defendant Hycel, Dr. Wecht testified as follows:

"Q. Getting a reading of this height with a patient that has no symptomatology of diabetes should be a red flag to a doctor, should it not?

A. Well, it's a red flag certainly that something has to be done for the patient.

Q. Doctor, is it your testimony that in good medical practice that if a physician received a reading of 2000 with a patient who has no symptoms whatsoever, no blood in his urine, no acetone in the urine that it is a good medical practice to start giving insulin?

A. Immediately it would be acceptable medical practice in my opinion for him to decide he's got to do something fast to get that hyperglycemia down before something goes wrong and I could not fault him for giving insulin on the basis of such a blood sugar reading.

Q. You are willing to testify to that, is that right?

A. I have said it a couple of times."

Dr. Dunphy testified that by the morning of February 1, 1968, after Kincl received insulin, his blood sugar level dropped; at this juncture, Dr. Dunphy thought the insulin caused the drop. He further testified that, at the time of Kincl's treatment, he was aware of a rare type of diabetes known as hyperglycemic nonketotic coma, where there is high blood sugar. In particular, Dr. Dunphy had read an article published in 1965 concerning the hyperglycemic condition. During the evening of January 31, 1968, he began rereading the article out of concern for Kincl. Dr. Dunphy testified that symptoms of the hyperglycemic condition corresponded with Kincl's symptoms: an absence of ketones, high blood sugar, and low sodium.

In his testimony, Dr. Dunphy indicated that he was continually informed of Kincl's condition by the nurses. Patricia Hambly, a registered nurse, was the night supervisor at Edward Hospital on the floor where Kincl was a patient on the night of January 31, 1968, and the morning of February 1, 1968. She testified that in her experience with Dr. Dunphy, she had never had any difficulty in getting him to come to the hospital on request. Dr. Dunphy testified that he was never requested to come to the hospital concerning Kincl. He further testified that he had never refused such a request.

The following evidence supported plaintiff in his suit against defendant Dunphy. Dr. Berger testified that there "really was no clinical evidence" of Kincl having a hyperglycemic nonketotic coma. In addition, he testified that in hyperglycemic nonketotic coma, there exists high blood sugar, high "solidium," profound dehydration, and a depression of consciousness. Hyperglycemia does not cause sweating, a symptom of Kincl's. An internist using good medical practice would measure glucose in any substance, such as Dextran, which conceivably could interfere with the analytical method. He would also measure glucose in the patient's spinal fluid. Dr. Berger further testified that if a patient has a sugar level of 2000 while Dextran is going into his veins, it is elementary intuition to blame the Dextran without looking for a rare, new disease. When a 2000 value is received, it is a very wild figure and where the patient is alert and not in shock, there is no urgent need to introduce therapy.

Based upon a hypothetical question incorporating testimony in this case, Dr. Berger testified that the best principles of contemporary medical practice were not followed by the hypothetical internist. He further testified as follows:

> "Q. Do you have an opinion, taking into consideration as stated in the hypothetical state of facts that this patient was mentally alert, coherent, was able to carry on a conversation and apparently felt well except for some slight pain in his chest, with the administration of insulin interference such as this? Do you have an

opinion taking into account the patient's condition I have just described whether it would be a good medical practice to start insulin therapy with such a patient?

A. The clinical circumstances you described are inconsistent with the blood sugar level of 2000 milligrams percent."

Hyperglycemia or diabetic dioacisdosis are the only justifications for a large administration of insulin, 300-400 units, over a 24-hour period.

Both Mirovsky and Dr. Dunphy testified that Kincl appeared to improve, on February 1, 1968, as a result of the injection of a sugar solution. During the morning of February 1, however, Dr. Dunphy ordered 50 units of insulin for Kincl; thereafter, Kincl began to have tremors of the extremities and heavy perspiration.

Dr. Jack Abbott, a pathologist called by defendant Hycel, testified as follows:

"Q. What is good medical practice, Doctor, with regard to diagnosis of diabetes?

A. I think to make a diagnosis of diabetes—or, for that matter, any disease—one has to take all of the facts that are available, the history, the physical findings, the state of the patient, his physical status, all the laboratory data, any other ancillary data that might be available, and I think you have to make a diagnosis based on your opinion, using all of these ancillary facts and figures. I think it is very dangerous to make a diagnosis on any one figure or any one test as a matter of fact, to base the diagnosis on just one finding. Most diagnosis have to be confirmed several different ways."

Dr. Irvin R. Henricksen, an assistant professor of internal medicine called by defendant Dunphy, testified that he would consult with a pathologist if he received a 2000 blood sugar reading which conflicted with the patient's clinical symptoms, because such a reading would be "a red flag."

Finally, Mirovsky testified that defendant Dunphy did not comply with her request that he come to the hospital and check Kincl, who was in critical condition. Mirovsky further testified that defendant Dunphy merely advised her to call defendant Markarian, the orthopedic specialist, although blood sugar falls within the expertise of an internist.

■■ We are inclined to believe that the verdict in favor of defendant Dunphy was not contrary to the manifest weight of the evidence. The evidence, indeed, was conflicting. It is not clearly evident that the jury wrongly decided the factual questions presented. See *O'Reilly*.

■■ Plaintiff's issues instruction limited the case against defendant Markarian to a single allegation of negligence: that he failed to be more insistent in getting Dr. Dunphy to come to Edward Hospital on February 1, 1968, when Kincl was in critical condition.

The following evidence supported plaintiff. Defendant Markarian

testified that he was not an internist. Diabetes is within the field of expertise of an internist. Indeed, Dr. Markarian did not claim to be familiar with all types of diabetes. Plaintiff, therefore, contends that defendant Markarian should have made a reasonable effort to have defendant Dunphy, an internist, examine Kincl and assume charge of the patient's care. Based upon a hypothetical set of facts, Dr. Wecht indicated, in his testimony, that defendant Markarian failed to conform to standard medical practice in that he should have been more insistent upon defendant Dunphy evaluating Kincl himself.

The following evidence supported defendant Markarian. Within approximately 4½ hours of defendant Markarian's February 1 visit with Kincl at the hospital, defendant Dunphy did come to call on Kincl. Defendant Markarian contends that the opinion of Dr. Wecht lacks probative value, because, in fact, defendant Dunphy frequently evaluated Kincl himself. Dr. Abbott testified that when a team of doctors treat a patient, it is good medical practice for one specialist to defer to another specialist on treating a problem falling in the second specialist's area of expertise. Thus, Dr. Markarian never prescribed any insulin for Kincl. We are unable to conclude that a verdict in plaintiff's favor was required by the evidence. The verdict in favor of defendant Markarian was not contrary to the manifest weight of the evidence.

■■ In plaintiff's negligence action, the theory of liability against Dr. Serna, the director of the Edward Hospital laboratory, was twofold: he failed to properly question or investigate the elevated blood sugar readings of Kincl; he failed to adequately communicate with the attending physician regarding the treatment and clinical picture of Kincl. The evidence supporting plaintiff is as follows. On January 31, 1968, defendant Olley tested Kincl's blood with a Hycel P.M.S. blood glucose test. It produced a reading of 2000 milligrams. Defendant Serna testified that he was aware of interferences with various types of tests. He did not check the urinalysis to see if sugar was present in Kincl's urine. Also, he did not contact Kincl's attending physician; however, at other times when he received a grossly low or high test result, he called the physician to see if the result was consistent with the patient's appearance. Defendant Serna did not confirm the 2000 reading by any other tests, though when defendant Olley later used an ortho-toludine test, a true reading of the amount of sugar in Kincl's blood was obtained. In addition, at trial, defendant Serna refused to admit that he had not investigated the possibility of an interference with the blood test. Instead, he claimed that he found it hard to remember what he had done at the time of Kincl's tests. Plaintiff contends that defendant Serna's testimony was impeached by a pretrial deposition in which he admitted to not checking whether Kincl received glucose or intravenous fluid on January 31, 1968, despite

earlier noting that false test readings can be due to a glucose intravenous interference.

Dr. Wecht testified, based upon a hypothetical set of facts, that a pathologist and director of a hospital laboratory does not conform to standard medical practice in a situation where an extremely high reading is obtained if he does not speak to the orthopedic surgeon or internist and learn more about the patient's clinical condition. Dr. Abbott testified that in good laboratory practice, the director of a laboratory would question the accuracy of a blood sugar test which produced a reading of 2000 and then contact the physician who ordered the test to discover if the patient was receiving anything which would cause the high reading. If the physician informed the pathologist that the patient had been receiving Dextran, good laboratory practice would require the pathologist to determine the chemical composition of Dextran and its effect on the particular method of testing. If information concerning an interference was not in the laboratory's literature, good procedure would require the laboratory to contact the manufacturer to see if it has an explanation. Dr. Abbott further testified that the pathologist might run the sugar test on the suspected interfering material itself.

The evidence supporting defendant Serna is as follows. Defendant Serna testified that, on January 31, 1968, he called the nurses to get information regarding Kincl's condition. He also testified:

"Q. And what did you learn?

A. Here again I am kind of hazy because this was—Happened five years ago and as I said I don't keep records like this of my calls, but I believe I learned this individual had fallen and fractured his bones and that he was receiving dextran and a plasma expander and that he had been a little mentally confused or something like that."

Before Dr. Nigro suggested a possible interference, defendant Serna checked his list of interfering medications, and found no relevant medications on the list. It was sent to all physicians on the attending staff of Edward Hospital; the list was kept up to date. Plasma volume expanders were not on the list. Defendant Serna further testified that he had not received any communications from Hycel about the interference factor of plasma volume expanders. In his brief against defendant Hycel, plaintiff admits that no one at Edward Hospital had received any form of warning from Hycel as of the time when. Kincl became a patient. Defendant Serna testified that the Hycel test had been approved by the College of American Pathologists, which led defendant Serna to have confidence in the test.

Dr. Alexander, in response to a hypothetical question incorporating defendant Serna's version of the case, indicated that defendant Serna

used the care and skill of a reasonably well-qualified pathologist in January and February of 1968. In addition, Dr. Alexander testfied that the problem of interference by plasma volume expanders was not commonly known in January and February of 1968. The "Physicians' Desk Reference," dated 1969, lacked any mention of the problem. Furthermore, in response to hypothetical questions offered by defendant Serna, Dr. Wecht gave testimony which was basically identical to Alexander's opinion testimony.

Defendant Serna testified that if a physician at Edward Hospital had a grossly elevated test reading, according to the custom at the hospital the physician would call defendant Serna, not vice versa.

In our opinion, the testimony of defendant Serna regarding his actions along with the testimony of Dr. Alexander and Dr. Wecht regarding standard medical practice was sufficient to support the jury's verdict in favor of defendant Serna. The verdict was not contrary to the manifest weight of the evidence. Indeed, the jury observed the demeanor of the witnesses, and their credibility was determined by the jury. In passing on the weight of the evidence, we cannot substitute our judgment for that of the jury. *Warren v. Johnson & Johnson* (1976), 39 Ill. App. 3d 1029, 351 N.E.2d 415.

■■ Finally, plaintiff contends that defendant Olley was responsible for the accuracy of the tests involved in the case at hand. Plaintiff further contends that since Olley was an employee of Edward Hospital, the hospital is liable for Olley's negligent acts; as support for this contention, plaintiff cites *Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, 211 N.E.2d 253. Plaintiff first contends that Olley was negligent because he would not necessarily look at any technical information which might be included in a shipment, when he unpacked materials received by the laboratory at Edward Hospital. Hence, plaintiff notes the testimony in which Olley admitted to not looking at technical information when it came in a shipment of materials for the laboratory. We note plaintiff's admission made at trial and in his brief for the appeal of defendant Hycel that Edward Hospital received no warning of the Dextran interference problem with respect to the Hycel test. When a plaintiff proves that a defendant was negligent, the plaintiff still may not recover unless the negligence was the proximate cause of the plaintiff's injury. (*Apato v. Be Mac Transport Co.* (1972), 7 Ill. App. 3d 1099, 288 N.E.2d 683.) If the shipments of Hycel reagent contained no warning regarding Dextran interference, any failure on the part of Olley to read packaging literature, at the time when he unpacked the reagent, could not be the proximate cause of Kincl's injury, because examining the packaging would not have apprised Olley of the interference problem. Negligent conduct cannot be the proximate cause of an injury, unless

there is evidence that but for the conduct, the injury would probably have not resulted. (*Clark v. Public Service Co.* (1934), 278 Ill. App. 426.) There is no such evidence in the case against defendant Olley.

Plaintiff contends that defendant Olley was negligent, because after Olley had obtained the sugar reading of 2000, he did not leave word to be contacted regarding any other high test results on Kincl's blood. In support of this contention, plaintiff points to a hypothetical question asked by his counsel. The question had the following facts:

> "The Chief Technician in the lab performed the blood sugar test and obtained a reading of 2000. He rechecked that reading by the same method and satisfied himself that the reading was technically correct and accurate.
>
> The Chief Technician then brought this reading to the attention of the Director of the Laboratory, pursuant to a rule in the lab that grossly elevated readings should be brought to the attention of the Director of the Lab.
>
> The Director of the Laboratory, being assured by the technician that the reading was accurate and had been checked, then called the reading up to the floor.
>
> The Chief Technician remained there that day, and left at his regular time, leaving no particular instructions to be called at home, or to be notified of any further blood sugar test or test results."

Dr. Wecht testified that the hypothetical chief technician did not conform, in every way to standard, laboratory and technological practice. Dr. Wecht further testified that when the hypothetical technician became aware of the high test levels, he should have "told the technicians that were coming on duty, when he was not going to be there the rest of that day and night, to watch out for this, let him know specifically about the test results and follow through a little bit more on it, pick it up, know where things were the next day when he came back to work."

The evidence supporting defendant Olley is as follows. Defendant Olley testified that when he returned to work on the morning of February 1, 1968, it was brought to his attention by a technician that Kincl's blood sugar test readings had been grossly elevated all through the night. Also, on the morning of February 1, defendant Olley checked a worksheet regarding Kincl's blood sugar count. We reject plaintiff's contention that defendant Olley failed to conform with the standard of conduct presented by Dr. Wecht.

In his final theory of liability plaintiff contends that defendant Olley was negligent in not calling defendant Hycel before reporting the 2000 reading to defendant Serna for the second time. On February 1, 1968, when defendant Olley called Hycel's technical service division in

Houston, Texas, he was informed of the Dextran interference problem. Thus, if defendant Olley had made that phone call on January 31, 1968, he would have been informed of the problem and Kincl would not have received insulin. Plaintiff, however, has no evidence that in failing to call Hycel, defendant Olley did not exercise the degree of skill and care required of a qualified laboratory technician. Furthermore, according to the testimony of defendant Olley, Dr. Wecht, Dr. Alexander, and Dr. Berger, a blood sugar reading of 2000 is not medically infeasible. On two occasions before working at Edward Hospital, defendant Olley encountered blood sugar readings as high as 2000. In our opinion, the jury might have determined from the evidence that on January 31, 1968, there was no reason for Olley to call Hycel upon obtaining the reading of 2000.

We can only conclude that the verdict in favor of defendant Olley was not against the manifest weight of the evidence, since the verdict was not wholly unwarranted and palpably erroneous. See *Costello*.

■■ We consider now the appeal by defendant Hycel. It contends that gross negligence on the part of Dr. Dunphy and Dr. Serna was the intervening cause of the injury to Kincl; therefore, Hycel is relieved of liability. However, in light of our disposition in the cross-appeal, we must reject defendant's contention. The jury considered whether Dr. Serna and Dr. Dunphy were guilty of negligence, and the jury found for those defendants. We decline to upset the results reached by the jury.

■■ ■ In the 10th amended complaint, given shortly before the beginning of trial, plaintiff revised the order of the named defendants, transferring defendant Hycel from the last position to the first position. Defendant Hycel contends that it was denied a fair trial, because the trial court violated Supreme Court Rule 233 (Ill. Rev. Stat. 1973, ch. 110A, par. 233) by allowing defendant Hycel to be listed as the first of the defendants. We disagree. Furthermore, defendant Hycel asserts that the intended result of the change in the order of the named defendants was to focus the attention of the jury on defendant Hycel. Supreme Court Rule 233 provides in pertinent part: "The parties shall proceed at all stages of the trial, including the interrogation of prospective jurors, opening and closing statements, the offering of evidence, and the examination of witnesses, in the order in which they appear in the pleadings, unless otherwise agreed, by all parties or ordered by the court." In our opinion, Rule 233 controls the actual trial. Thus, a pretrial amendment of pleadings cannot constitute a violation of Rule 233. In addition, under Rule 233, the trial court has discretion to control the order of proof and argument regardless of the pleadings. (See *Department of Business & Economic Development v. Brummel* (1972), 52 Ill. 2d 538, 288 N.E.2d 392.) We note that permission to file an amendment of pleadings rests within the discretion of the trial court, and, on review, the trial court's ruling will not

be disturbed unless there was a manifest abuse of discretion. *Hastings v. Abernathy Taxi Association, Inc.* (1973), 16 Ill. App. 3d 671, 306 N.E.2d 498.

■■■ Under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1973, ch. 110, par. 60), plaintiff called defendants Olley, Markarian, Serna and Dunphy as adverse witnesses; defendant Hycel contends that the trial court grossly abused its discretion by allowing plaintiff to examine the four witnesses as to matters relating solely to the possible liability of defendant Hycel. For support of its contention, defendant Hycel cites *Lantz v. Dortman* (1945), 324 Ill. App. 564, 58 N.E.2d 922. However, in *Lantz*, we can find no support for the contention. In *Lantz*, the plaintiff sued a drunk driver and, under the Dramshop Act (Ill. Rev. Stat. 1973, ch. 43, par. 135), the tavern at which the driver had become intoxicated. On review, the court held that the trial judge properly denied the plaintiff the right to examine the driver as an adverse witness, because it was difficult to keep the two issues separate. One issue involved a violation of the Dramshop Act and the other issue involved personal injuries. The court found that the jury was confused. We do not find such confusion in the instant case. Furthermore, Illinois case law provides that when one defendant is called by the plaintiff as an adverse witness and that defendant testifies to the detriment of other party defendants, they may immediately examine the defendant witness on matters to which he testified. (*Economy Truck Sales & Service, Inc. v. Granger* (1965), 61 Ill. App. 2d 111, 209 N.E.2d 1; *Cascio v. Bishop Sewer & Water Co.* (1954), 2 Ill. App. 2d 378, 119 N.E.2d 531.) Since defendant Hycel, at the discretion of the trial court, could properly have examined defendants Olley, Markarian, Serna, and Dunphy at the conclusion of their testimony under section 60, as to matters upon which they had testified, we believe that the trial court properly permitted the four witnesses to be examined on matters concerning the possible liability of defendant Hycel. In other words, the trial court did not abuse its discretion, since defendant Hycel could properly have tested the significance, if any, of the testimony, through cross-examination of the four witnesses.

■■ We disagree with defendant Hycel's contention that the trial court erred in refusing to grant a continuance after defendant Hycel was surprised by the evidence deposition testimony of Albert Long. Where a motion for a continuance is not based on a statutory cause, the motion is addressed to the sound discretion of the trial court. (*Needy v. Sparks* (1977), 51 Ill. App. 3d 350, 366 N.E.2d 327; *Thomas v. Thomas* (1974), 23 Ill. App. 3d 936, 321 N.E.2d 159.) The exercise of such discretion will not be disturbed on appeal unless there has been a manifest abuse of discretion or a palpable injustice. (*Needy; Thomas*.) In *Needy*, the court said: "Because of the potential inconvenience to the parties, witnesses,

and the court, especially grave reasons for granting a continuance must be given once a case has reached the trial stage. (*Schneider v. Seibutis* (1972), 3 Ill. App. 3d 323, 279 N.E.2d 37.)" (51 Ill. App. 3d 350, 358.) Indeed, defendant Hycel's motion for a continuance was made in the midst of trial. Furthermore, the motion was not supported by an affidavit showing how defendant Hycel was surprised. Before the evidence deposition was taken, defendant Hycel took a discovery deposition of Long; this factor is most significant. Given these circumstances, we cannot say that the refusal of the motion for a continuance was an abuse of discretion or a palpable injustice. See Ill. Rev. Stat. 1973, ch. 110A, par. 231; *Parker v. Newman* (1973), 10 Ill. App. 3d 1019, 295 N.E.2d 503; *Waidner v. Pauly* (1890), 37 Ill. App. 278, *aff'd* (1892), 141 Ill. 442, 30 N.E. 1025.

The next issue we will consider concerns whether there was error in the trial court's rulings on two of Hycel's hypothetical questions. Defendant Hycel contends that the trial court erred in excluding expert opinion evidence which it sought to have elicited on cross-examination of Dr. Henricksen and Dr. Alexander, expert witnesses called by defendants Dunphy and Serna.

■■ Defendant Hycel's counsel attempted to ask Dr. Henricksen a hypothetical question incorporating the controverted fact that Kincl was not dehydrated. However, when the hypothetical question was posed, no evidence was introduced suggesting that Kincl was not dehydrated. The trial court sustained an objection to the question. We believe that the objection was properly sustained. A hypothetical question may not include facts which are not yet in evidence, unless there is a promise that such facts will be adduced in evidence later. (*Needy; Hahn v. Eastern Illinois Office Equipment Co.* (1976), 42 Ill. App. 3d 29, 355 N.E.2d 336; *Nickla v. Industrial Fire & Casualty Insurance Co.* (1976), 38 Ill. App. 3d 927, 349 N.E.2d 644.) Such a promise was not made here. Defendant Hycel could have properly recalled Dr. Henricksen after supporting evidence had been introduced for the hypothetical fact. *Needy*; see *People v. Muniz* (1964), 31 Ill. 2d 130, 198 N.E.2d 855.

■■ Defendant Hycel argues that the trial court erred in ordering Hycel to include in its hypothetical question to Dr. Alexander both testimony favoring defendant Serna and conflicting evidence constituting Hycel's version of the facts. In support, defendant Hycel cites *Graham v. St. Luke's Hospital* (1964), 46 Ill. App. 2d 147, 196 N.E.2d 355. It held that a hypothetical question should not embrace conflicting evidence, and a party is entitled to pose a hypothetical question based solely on the testimony supporting his own theory of the case. However, we believe that *Graham* does not control our decision in the case at bar. When defendant Hycel was required to put an alternate version in his hypothetical question to Dr. Alexander, counsel for defendant Hycel filed

to object. Because of this failure, defendant Hycel is now foreclosed from urging error. (*Morris v. Stewart* (1972), 4 Ill. App. 3d 322, 280 N.E.2d 746.) Furthermore, we note, in passing, that in his answer to the hypothetical question, Dr. Alexander gave testimony which was favorable to defendant Hycel and which adequately exposed Hycel's theory to the jury.

■■ Defendant Hycel contends that numerous improper statements were made by plaintiff's counsel during his closing and rebuttal arguments. During those arguments, defendant Hycel made no objections. Therefore, any objection in this court is waived. *Nowakowski; McElroy v. Force* (1967), 38 Ill. 2d 528, 232 N.E.2d 708.

■■ Defendant Hycel also contends that the damages awarded by the jury are excessive. This claim of error was not included in defendant Hycel's post-trial motion. Thus, we will not consider the alleged error; when errors in a jury case are specified in a post-trial motion, any errors not included in the motion are waived upon appeal. Ill. Rev. Stat. 1973, ch. 110A, par. 366(b)(2)(iii); *General Motors Acceptance Corp. v. Allen* (1964), 52 Ill. App. 2d 114, 201 N.E.2d 747; *Wolfstein v. Illinois Power & Light Corp.* (1929), 254 Ill. App. 362; *Brewer & Hoffman Brewing Co. v. Boddie* (1896), 162 Ill. 346, 44 N.E. 819.

■■ From the outset, defendant Hycel has argued that because of errors committed by the trial court, Hycel was deprived of a fair trial. In support of this argument, defendant points to numerous issues concerning allegedly prejudicial and improper actions by the trial court. Some of those issues were discussed above. We have considered, but find it unnecessary to discuss, the other issues raised by Hycel which we find to be lacking in merit. On review, our object "is not to determine whether the record is totally free of error, but whether any error occurred which operated to the prejudice of the appellant or unduly affected the outcome below." (*Needy*, 51 Ill. App. 3d 350, 372; *Chloupek v. Jordan* (1977), 49 Ill. App. 3d 809, 364 N.E.2d 650.) We have painstakingly reviewed the record and conclude that defendant was not prejudiced by the court below, and that a reversal is not required.

For the reasons presented, we affirm the judgment of the circuit court of Cook County as to the appeal of defendant Hycel and the cross-appeal of plaintiff.

Affirmed.

LORENZ and MEJDA, JJ., concur.