OLD SECOND NATIONAL BANK OF AURORA, Adm'r of the Estate of Roger J. Sebby, Deceased, Plaintiff-Appellant, *v.* PATRICK L. GOULD, Defendant-Appellee.

Second District 78-393

Opinion filed August 30, 1979.

Robert L. Speers, George P. Lindner, and William C. Murphy, all of Reid, Ochsenschlager, Murphy & Hupp, of Aurora, for appellant.

Barry L. Kroll, Lloyd E. Williams, Jr., David A. Novoselsky, and Craig A. Tomassi, all of Jacobs, Williams & Montgomery, of Chicago, for appellee.

Mr. JUSTICE RECHENMACHER delivered the opinion of the court:

Roger Sebby died from injuries sustained when his motorcycle collided with a car driven by Patrick L. Gould. The Old Second National Bank of Aurora, as administrator of the estate of Roger Sebby, subsequently brought a wrongful death action against Gould. A jury trial ended with a verdict and judgment in Gould's favor and the plaintiff appeals contending that the verdict was against the manifest weight of the

evidence. The scene of the accident has been termed a "K" intersection in Aurora, where Concord and Marion Avenues intersect Lincoln Avenue, a four-lane highway (with two lanes used for parking). This point is a terminus for both Concord and Marion. Lincoln Avenue (which may be visualized as the vertical line of the "K") runs in a north-south direction; Marion Avenue (the upper branch of the "K") runs into Lincoln from approximately the northeast, while Concord (the lower branch of the "K") merges into Lincoln from the southeast, so that the right side of Concord joins Marion to form a corner, while the left side of Concord joins, and merges with, the east side of Lincoln. Thus, an auto proceeding south down Lincoln would have the option of veering left off Lincoln to head southeast down Concord, or of making a sharper turn to the left and proceeding up Marion to the northeast. The intersection was well lighted at the time of the accident, which was shortly after midnight on July 28, 1976. There are stop signs on Concord and Marion, but not on Lincoln; the intersection is marked by a flashing yellow caution light. It was not raining, and the pavement was clear and dry.

The only eyewitnesses to the actual impact were Gould and John Gary, a friend and co-worker.

Gould testified that he was driving his AMC Gremlin south on Lincoln, giving Gary a ride home from work, as he approached the intersection at a speed of 30 miles per hour. Gould stated that he was able to observe the intersection clearly from at least 100 feet away and could also see the flashing yellow caution light. While approximately 50 feet from the intersection, Gould glanced down Concord, briefly noticing a man inside a nearby building. Gould could also see two cars which were approximately a block away, approaching the intersection from the south. Gould slowed to 25 miles per hour as he entered the intersection. At some point, after beginning his turn onto Concord, Gould saw a flash of light, and an instant later observed the decedent's body being thrown over the car, his foot striking the windshield. Gould did not see the motorcycle until after the accident. Gould's testimony placed the impact at a point on Concord, past the spot where Gould turned off Lincoln. After the collision, Gould's car stalled and coasted a short distance up Concord, where Gould pulled the car over to the left-hand curb.

Gary's testimony provides some support for Gould's version of the accident. Gary testified that Gould's speed, as they approached the intersection, was about 30 miles per hour. Just before they reached the intersection, Gary looked down at the dash board, and thus did not have an opportunity to observe whether any traffic was approaching them up Concord. However, Gary did observe a flash of light in front of him, on the passenger side of the car, a "split second" before impact. Gary testified that the collision occurred in the "southeastbound lane" on the

turnoff onto Concord, somewhere just past the turnoff point. Thus, the testimony of both Gould and Gary would indicate that Gould had largely completed his turn onto Concord and was in his proper lane when the collision occurred.

There was one other witness who was at the scene at the time of the occurrence, but did not observe the actual impact. Charles Alderson, an off-duty Aurora police officer, testified that he was standing in front of a residence on Lincoln Avenue approximately 100 feet from the intersection of Lincoln, Marion and Concord, when he "heard a traffic collision." Officer Alderson turned in the direction of the sound, and saw Gould's auto going southeast on Concord, just east of Lincoln, at about 10 miles per hour. Alderson did not hear the screeching of brakes being applied prior to the noise of the impact. Although the officer did not see the collision itself, he stated that he turned and observed the auto within a second of the impact. At that point, according to the officer, the Gremlin had reached a point at about the centerline of Marion, a few yards to the northwest of the point where Gould claimed that the collision occurred.

The plaintiff introduced the testimony of two friends of the decedent. This testimony indicated that Roger Sebby operated his motorcycle in a slow and careful manner on the many occasions when the witnesses observed him.

However, the heart of the plaintiff's case consisted of testimony regarding physical evidence found at the scene, shortly after the accident. Some of this evidence was observed by Officer Alderson, who ran to the intersection moments after the impact. Alderson found that Roger Sebby had ceased breathing, and acted with commendable skill and promptness by clearing the decedent's airway, and administering rhythmic pressure to his chest until the decedent began breathing, and his heart started to beat again; the decedent died later, at the hospital. After paramedics arrived, Alderson assisted another officer, George Gramme, who had been called to the scene to investigate the accident. Using rulers and measurements, Officer Gramme prepared a diagram showing the intersection and the location of all of the observable physical evidence. This evidence contradicts Gould's and Gary's testimony as to the point of impact.

Although Gould and Gary both testified that the impact occurred after they had turned off of Lincoln, the physical evidence seems to demonstrate that the impact occurred in the northbound lane of Lincoln. This would indicate that Gould was "cutting the corner" and not in his proper lane when the collision occurred. It is evident from photos of the Gremlin and the motorcycle that the collision was head-on and the Gremlin's radiator was ruptured by the impact. The officers observed a single, narrow skid mark, 27 feet long, with a light powder on the mark

indicating that it was fresh. The skid mark was approximately in the center of the northbound lane of Lincoln; its northernmost point was just south of Marion. A trail of water from the radiator of the Gremlin commenced at a point intersecting the skid mark at or within a few feet of its northernmost point and ran 99 feet up Concord to the place where the Gremlin was parked by the left curb. The obvious and compelling inference raised by the skid mark and water trail is clearly that the point where they intersected in the northbound lane of Lincoln was the point of impact. The position where the decedent's body was found, in the northbound lane of Lincoln, a few feet from the place where the skid mark and water trail meet, is supportive of this conclusion. The point where the decedent's body was found is not as consistent with Gould's account, since the body was some 75 feet from the spot where Gould contends that the collision occurred. After the accident, the motorcycle was located near the water trail, but some 45 feet *behind* the place where Gould said the impact occurred; it would appear that the only way the motorcycle could have ended up where it did, if the collision occurred where Gould and Gary said that it occurred, would have been if the motorcycle were thrown over Gould's car, along with the decedent. This would not only be unlikely physically, but would also seem improbable in view of the fact that neither Gould nor Gary testified that the motorcycle went over the car. By contrast, the motorcycle was found in a spot consistent with it being thrown back after colliding with the heavier Gremlin on Lincoln, at the northernmost point of the skid mark. Finally, the officers discovered the engine cover from the motorcycle in the northbound lane of Lincoln, near the skid mark, and the motorcycle's gas tank at a point behind the spot where Gould said the impact occurred. Thus, the testimony of Gould and Gary is squarely contradicted by the physical evidence.

There was one further item of evidence, with an important bearing upon this case, which must be mentioned. Officer Gramme examined the motorcycle headlight and found that the light had been "on" at the time of the impact. This fact again raises serious questions about Gould and Gary's testimony. If the impact occurred where Gould said it did, after the Gremlin had all but passed Marion, then the decedent's motorcycle could not have emerged from Marion, immediately prior to the impact; had it done so, the motorcycle would have hit the Gremlin on its left side, instead of head on. The night was clear, the intersection was well lighted, and Gould claims to have looked up both Lincoln and Concord before making his turn. The obvious question is, how could Gould have looked but failed to see the light of the motorcycle?

In closing argument to the jury, counsel for Gould raised certain suppositions in an effort to explain the physical evidence observed by

Officers Alderson and Gramme. It was submitted that Gould may have failed to observe the motorcycle light until the instant before impact, because the decedent could have been driving with the light turned off and only reached over and turned it on after he observed Gould's car and realized his peril. Of course, one would expect that the decedent would have been fully occupied with an instinctive effort to stop or maneuver the motorcycle to avoid a collision, in those seconds before impact, and the thought that he would reach over and flick on the light at the same time, seems improbable in the extreme. Gould's counsel also argued (and reiterate in their brief to this court) that the single 27-foot skid mark could have been made by some other motorcycle, shortly before the accident. It is asserted that Officer Alderson's failure to hear a screeching sound prior to the impact supports this view. However, Alderson was some 100 feet from the intersection, and the comparatively light motorcycle, with its narrow tires, would not make a very loud sound when the brakes were applied. A maneuver by a motorcycle which would leave a 27-foot skid mark would be unusual, and it would be a remarkable coincidence if some unknown motorcyclist had executed such a maneuver at that spot, just before the accident. In a similar vein, counsel argued that the water trail between the radiator of the Gremlin and the skid mark could have been caused by water leaking out of the Gremlin, after it was parked at the curb; this view, it is argued, is supported by Alderson's initial failure to observe the water trail. Since Officer Alderson was fully occupied, after arriving at the scene, by his effort to save the decedent's life, the fact that he did not immediately observe the water trail is of no significance. Although it appears that the streets at the intersection were either level or almost level, without knowing for certain whether there was or was not a slight slope down Concord, and without knowing the volume of the Gremlin's radiator or the absorptive quality of the street, we cannot say that it would have been impossible for water from this radiator to flow back 99 feet to the location of the skid mark. Yet such a result would be, in our view, surprising and unlikely. The chances of a concurrence of the improbabilities upon which Gould relies to "explain away" the physical evidence, seems so remote as to be unworthy of serious consideration. Yet it would appear from the verdict that the jury in fact accepted the theories advanced by Gould's counsel.

It is axiomatic that a jury verdict will not be disturbed on appeal unless it is contrary to the manifest weight of the evidence. For the jury's verdict to be against the manifest weight of the evidence, "* * * it must appear that when viewing all the evidence in a light most favorable to the opponent, conclusions reached by the jury are palpably erroneous and wholly unwarranted." *Kincl v. Hycel, Inc.* (1977), 56 Ill. App. 3d 772, 779. ■■ However, there is another principle which we must also consider.

The trier of fact must, as a matter of law, reject testimony which is physically impossible, or so inherently improbable as to be contrary to the common experience of mankind. (*Cochran v. Consumers Co.* (1972), 8 Ill. App. 3d 535 (abstract); *Turner v. Seyfert* (1963), 44 Ill. App. 2d 281; *Chicago v. N. W. Ry. Co. v. Van Every* (1902), 101 Ill. App. 451; *Peters v. Fitzpatrick* (7th Cir. 1962), 310 F.2d 704.) In our view, the physical evidence and testimony demonstrating that the collision occurred at the spot in the northbound lane of Lincoln where the skid mark and water trail intersected were so strong that the jury was bound, as a matter of law, to reject Gould's and Gary's testimony that the impact occurred after the Gremlin had turned off onto Concord. On this same basis, the jury was required to reject the supposition that Roger Sebby did not turn his headlight on until the instant before impact.

■■■ Since the jury was bound to find that the collision occurred in the northbound lane of Lincoln and that Roger Sebby had his headlight on prior to the accident, it follows that the verdict for the defendant was contrary to the manifest weight of the evidence. In any automobile accident involving a head-on collision, a driver who was not in the proper lane at the time of the collision is presumed to have been negligent. (See *Calvetti v. Seipp* (1967), 37 Ill. 2d 596.) Here, the only explanation which can be inferred from the record for the presence of Gould's auto in the northbound lane of Lincoln is that Gould started to veer toward the left, to move onto Concord, prior to reaching the intersection itself, and that in the process of thus "cutting the corner" he crossed the centerline into the northbound lane and struck Roger Sebby's motorcycle. This explanation would, of course, reinforce, rather than overcome, the presumption of negligence. Further, a motorist has a duty to maintain a proper lookout for traffic and is negligent if he fails to do so. (*Glenn v. Mosley* (1976), 39 Ill. App. 3d 172.) It is well established that

> "* * * one may not look with an unseeing eye and be absolved of the charge of negligence by asserting that he maintained a continous lookout, yet failed to see that which he clearly should have seen. [Citations.]" (*Payne v. Kingsley* (1965), 59 Ill. App. 2d 245, 250 (involving claim by motorist that he looked but failed to see motorcycle until instant before collision).)

(See also, *e.g., Waldron v. Hardwick* (1968), 99 Ill. App. 2d 36.) In this case, Gould himself testified that the intersection was well lighted, and although he claimed to have looked up both Concord and Lincoln, his only explanation for failing to see the headlight of the approaching motorcycle was his counsel's theory that the decedent did not turn the light on until the instant before impact. These circumstances could lead a reasonable man to but one conclusion; that Gould was negligent for failing to keep a proper lookout. Finally, since the physical evidence

established that Roger Sebby was in his proper lane, had his headlight on and applied his brakes prior to the collision, the record would not support a jury finding that the decedent was guilty of contributory negligence. Thus, the verdict cannot stand.

While certain other arguments have been raised by the Old Second National Bank of Aurora on appeal, we find that it is unnecessary for us to explore them under our holding herein.

Since the judgment of the circuit court of Kane County was based upon a verdict which was against the manifest weight of the evidence, the judgment herein must be reversed and the cause remanded for a new trial.

Reversed and remanded.

SEIDENFELD and WOODWARD, JJ., concur.