SAMUEL ROY BROUSSARD, a Minor, by Hollis Eugene Broussard, his Father and Next Friend, Plaintiff-Appellee, *v.* HUFFMAN MANUFACTURING COMPANY, a/k/a Huffy, Inc., *et al.*, Defendants-Appellants.—(INTERNATIONAL MACHINES & TOOL, INC., Defendant.)

Third District   No. 81—160

Opinion filed July 14, 1982.—Modified on denial of rehearing September 9, 1982.

BARRY, P. J., dissenting.

Barry L. Kroll, of Jacobs, Williams & Montgomery, Ltd., of Chicago, for appellant National Can Company.

Richard G. French, of French and Rogers, of Chicago, for appellant Huffman Manufacturing Company.

Richard T. Buck and Theodore J. Jarz, both of McKeown, Fitzgerald, Zollner, Buck, Sangmeister & Hutchison, of Joliet, for appellee.

JUSTICE HEIPLE delivered the opinion of the court:

This is an appeal from a judgment entered by the circuit court of Will County on jury verdict in favor of the 15-year-old plaintiff, Sam Broussard. The original suit was brought by Sam's father and next friend, Hollis Eugene Broussard, to recover damages for injuries sustained by Sam in a gasoline fire in the family garage. The suit sounded in products liability and alleged that the gasoline can involved in the fire was unreasonably dangerous in a way which proximately caused Sam's injuries. The defendants were the parties who designed, manufactured and distributed the can and its component parts.

The gasoline can in question was sold to Sam's father by defendant Hornsby's Store. The can was assembled and distributed by Huffman Manufacturing Company (Huffy). Huffy bought the can body from defendant National Can Company (National Can). At the time the can was bought by Huffy, National Can had a threaded neck soldered to the top plate of the can and had a handle soldered to that top plate as well. The threaded neck was manufactured by defendant International Machine and Tool Works (International). At the time of purchase by Huffy, the gas can was incomplete in that there are two openings made by National Can in the top plate: one large one for the screw-on spout assembly to which the neck had already been soldered and one small opening for the insertion of a pressed-in plastic vent cap known as a "poly-vent." The purpose of the poly-vent is to relieve vacuum inside of the can. Huffy manufactured the screw-on nozzle as-

sembly from two caps soldered back to back with a hole punched in the center where a flexible nozzle is attached. The two screw-on caps are manufactured by International for a variety of purposes. A closing plug, designed to screw in the end of the nozzle opposite the spout was also made by International. This closing plug was used in the assembling process by Huffy to close the can when the nozzle was inserted, nozzle down in the can. The can is sold for storage and transportation of up to two gallons of gasoline.

Following a jury trial, a verdict of not guilty was rendered in favor of the neck and cap manufacturer, defendant International, while a verdict of guilty was returned against defendants Hornsby's Store, Huffy and National Can in the amount of $1,350,000.

Defendants Huffy, Hornsby's Store, and National Can appeal alleging numerous trial errors. They also contend that there is no probative evidence in the record to support the verdict or, in alternative, that the verdict was contrary to the manifest weight of the evidence.

On April 12, 1977, the plaintiff Sam Broussard was 12 years old. On that day he returned home early from visiting a friend. He found no one home and the house locked. He opened the overhead door to the garage of his house and decided to wait in there until someone came home. Soon thereafter a tragic fire occurred in the garage whereby Sam sustained second and third degree burns over his face, neck, trunk, chest, back, and arms. The burns were caused by a gasoline fire. The origin of this fire is a matter of dispute between the parties. The gasoline which burned had been contained in a two-gallon gasoline can which Sam's father had purchased seven months earlier from defendant Hornsby's Store. The gasoline can had been kept in the garage and was used to transport gasoline to his home for use in his lawn mower.

There appears to be no dispute that the gasoline can designed, manufactured and sold by the defendants, was one instrumentality of the fire. The issue in the cause is whether the can was unreasonably dangerous, and if so, whether that condition was the proximate cause of the fire injuries received by Sam.

The initial point of contention between the parties is what factually occurred when Sam returned home around noon on April 12, 1977. Sam Broussard testified that it was a hot day, in the low 90's, and that he arrived home around noon from spending the morning at a friend's house. He found the house locked and went into the garage to wait for someone to come home. He closed the door behind him. He amused himself by teasing his pet dog with its bone. The dog be-

gan chasing Sam. Around in circles they chased, still confined to the garage. The playing continued for about 20 minutes when Sam, looking back over his shoulder at his dog chasing him, ran into the subject gasoline can and tripped on it. According to Sam, the gasoline can slid about five feet "and then gasoline came out and it just exploded, like woof, like that." He testified that when he kicked the can, the cap was on, but after so doing he looked back and knew the lid was off because he saw gasoline coming out. Sam said that gasoline was coming out of the can as it was sliding even before it started to tip. Sam testifed that it just started on fire "like when it was halfway out of the can." He did not know how the gasoline caught on fire. He didn't see anything that started it.

The plaintiff alleged several product defects: (1) the can was designed so that it was unstable. This allegedly contributed to spillage when being kicked by Sam; (2) the poly-vent cap was defectively designed and manufactured in that the poly-vent cap did not have adequate provisions for venting internal pressures and would not close itself once it popped open; (3) the cap was defective in that the nozzle assembly had an unsafe closing device. This "unsafe closing device" allegedly permitted gasoline spillage when Sam kicked the can approximately five feet; (4) the neck component lacked a sufficient number of threads to permit adequate closing of the cap onto the threaded neck; (5) the neck component was also unsafe due to a manufacturing defect: a globule of solder on the neck threads which impeded proper can closure. Against defendant Hornsby's Store, the plaintiff asserted the sale of a product, a gasoline can, with an unsafe closing device, an unsafe venting device, and an unstable body.

The defendants claim that it was scientifically impossible for the incident to have occurred as Sam testified. Also, defendants assert various circumstantial and scientific facts impeach both Sam's testimony and his credibility. Further, defendants introduced the testimony of a fellow hospital patient with Sam who testified that Sam told him that he, Sam, was working on a wood project and accidentally dropped a match in or near the gasoline can.

The basic product defect responses varied according to each defendant. Defendant International contended that the threads on the neck were safe; if properly closed, it would fully seal in the cap. Defendant National Can contended that the can was sufficiently stable for normal circumstances. National Can further contended that there was no solder on the neck of the can when it left its possession. National Can demonstrated through expert testimony that the solder drop formed on the threads as a result of the fire.

Even assuming that one of the aforementioned alleged defects contributed to the spillage of gasoline when being kicked five feet, all defendants asserted that the release of the gasoline alone did not produce a fire. An ignition source was needed to create the fire. The defendants assert the ignition of a fire, by whatever means the laws of science allow, is an intervening cause rendering any allegedly defective condition of the can only a prior condition to, but not a proximate cause of, the subsequent fire.

In our scrutiny of the record we find that the probative evidence fails to support the jury's verdict against the defendants.

In addition to his own testimony about the accident, the plaintiff introduced the testimony of several persons. The plaintiff's father, Hollis Eugene Broussard, testified the cap on the can would not always screw on completely and the vent cap would sometimes pop open on warm days and after gasoline was poured into the can. On the evening before the accident, Hollis Eugene Broussard used the gasoline can twice to refill his lawn mower. The last time he used it, he was sure that he closed the cap on the can securely and placed the can in the garage in the corner. He did not recall any trouble closing the cap that evening. The yellow plastic poly-vent was closed. The flexible pour spout was placed back inside the can. He further stated that some gasoline remained in the can, perhaps a gallon.

The plaintiff's evidence regarding the alleged unreasonably dangerous condition of the can, as well as causation, came from the testimony of Mr. Fred Schwartz, whom the plaintiff presented as an expert.

Schwartz testified generally as to design consideration for containers of hazardous substances. He stated that all of his design criteria pertained to two-gallon gasoline cans. He testified that gasoline is classified by the Federal Department of Transportation as a hazardous substance.

During his two days of testimony, Schwartz examined the subject gasoline can. He gave his opinion that it was unreasonably dangerous with regard to "closure integrity," stating that the number of threads on the neck of the nozzle closure needed to be increased. Presently, the cap only required one-half turn. His design recommendation was to increase the threads so that three or four turns would be required to close the can.

Schwartz also testified that a drop of solder present on the threads affected the turning and force needed to turn the nozzle to the closed position. This, he asserted, was an unreasonably dangerous condition. Schwartz further opined that there was a very high proba-

bility that the solder was present on the threads before the fire.

While Schwartz testified that a frictional spark from the can when it was kicked could have been the ignition source for the fire, he admitted that he never performed any tests or experiments on the subject similar can to support his opinion.

Schwartz also testifed that the gasoline can was unreasonably dangerous, lacking stability because it would tilt over if it was on a 30° incline.

The record demonstrates that while Mr. Schwartz was probably qualified to testify as an expert in several areas, he was not qualified to render an expert opinion concerning defects in the design and manufacture of two-gallon gasoline cans. His degree in civil engineering provided him with no special knowledge of gasoline cans. He possessed no degree or training in the field of mechanical engineering. He never designed gasoline cans, nor was he ever involved in the manufacture of portable hand-carried gasoline containers. He admitted his experience was limited to highway or railway cars as transportors of "hazardous substances." Further, we note no evidence of training or experience which would impart to Mr. Schwartz any special knowledge of combustion, ignition sources, or the grade of metal used in the can.

We recognize that gasoline is a hazardous substance. Likewise, we recognize that a railway tank car that transports hazardous substances is similar, in a sense, to a two-gallon gasoline can. The differences, however, outweigh the similarities. We find the similarities too remote for the great credibility ultimately placed upon an expert's opinion.

■ ■ One qualified by professional, scientific, technical training, or by practical experience, in regard to a particular subject, which imparts to him a special knowledge not shared by persons in the ordinary walks of life, may testify as an expert. His testimony as an expert, however, must be on questions coming within the field of his training or experience. In the instant case Schwartz testified about materials outside of his area of expertise when he testified about the subject gasoline can. In fact, he specifically stated he had no experience with design or manufacture of any type of portable, hand-carried gasoline cans. Hence, he was not competent to testify as an expert on that subject.

■ ■ Although the trial judge has broad discretion in determining if a witness has been qualified as an expert (*Northern Illinois Gas Co. v. Wienrank* (1966), 66 Ill. App. 2d 60), our analysis of the transcript causes us to find that this discretion was abused with respect to

Schwartz. Since there is no general presumption that a witness is competent to give an opinion, it is incumbent upon the party offering the witness to show that the latter possesses the necessary learning, knowledge, skill or practical experience to enable him to give opinion testimony. Direct examination of Schwartz as to his education and professional experiences revealed no special knowledge of the subject under scrutiny, gasoline cans. Accordingly, defendant National Can asked to cross-examine Schwartz as to his qualifications as an expert. The trial court denied this request. Without any further questioning of the witness as to his qualifications, the trial court found Schwartz qualified as an expert in the instant case. Such a finding is without any basis in the record. Hence, his subsequent testimony should not have been considered by the jury, and it was prejudicial error for them to so consider it. *Murphy v. Hook* (1974), 21 Ill. App. 3d 1006.

While numerous witnesses were called by the defendants, the essential testimony was presented by two experts and a boy who shared a hospital room with Sam Broussard for six days while Sam was being treated for his injuries following the fire. Two engineer executives of defendant Huffy also testified as to the manufacturing process involved in attaching the necks to the cans.

One of the experts, called by defendant Huffy, was Robert Bambenek. He presented expert testimony on the condition of the subject can and what its present charred condition revealed about the fire. He also testified about the ignition source of the fire. Bambenek was eminently qualified to so testify, having earned bachelor of science and master of science degrees in mechanical engineering and a master of science degree in gas technology. Professionally, he specialized in the investigation of accidents which involved some form of explosion or fire. He testified as to the following properties of gasoline: that for gasoline to burn it must be between 1.5% and 7.5% gasoline to air; that the liquid cannot burn, only the vapor; that in a can gasoline is safe and only when it spills out of a can does it become hazardous; that gas vapors must have a source of ignition in order to burn; that gasoline is manufactured to explode—that is its sole purpose.

By physical examination of the burn pattern on the can, Bambenek determined that at the end of the fire, the gasoline in the can was at least one-inch deep and at least halfway up to the spout. For this to occur, the cap had to have been on during the fire. The spout was inserted in the can, and the union to the spout was closed.

If the cap assembly had flown out of the can upon impact of a kick by Sam, the burn patterns would have been entirely different. The line of demarcation would have been no more than one-half inch

above the bottom of the can as the carbon deposits would have been no more than one-half inch up, and solder would have been found to have run to the bottom of outlet instead of on the side. Bambenek stated that heat of the fire causes solder to melt in five seconds after exposure to gasoline flame. The solder was originally all around the neck between the threaded outlet and the top enclosure. During the fire the solder melted so it flowed downward due to gravity until it reached the metal which was cooler. It then resolidified. The deposit of solder on the thread is an area where the can was cooler. With the cap on the can, lying on its side, solder can flow under the cap onto the threads of the neck towards a cooler region where it resolidified. If the cap had been off during the fire, the solder would not have resolidified on the threads of the neck.

In Bambenek's opinion, the instant fire could not have been ignited by a spark caused by kicking the can. He testified that the can is made of tinplated steel, which is a soft metal, and will not spark under the described conditions. Further, a spark close to the floor could not have ignited the gasoline because the gasoline to air mixture is too rich and is not flammable at that point. The source of ignition could not be directly on the floor or over two to three feet above the floor. The ignition source had to have been one-quarter inch off the floor to two feet off the floor, because that is where the flammable mixture would occur.

In Bambenek's opinion, the subject gasoline can was reasonably safe for the purpose intended. As for the poly-vent, its purpose is merely to release a vacuum when pouring gasoline from the can. It is not to relieve pressure in the can. The poly-vent, in his opinion, had nothing to do with the damage to the can or the fire. As to the number of threads on the cap, he felt they were sufficient to pull the gasket down and create a seal.

Defendant Huffy also presented the testimony of Carl James Dahn, a consulting engineer, who had earned a bachelor of science in aeronautic engineering and was a registered professional engineer. He had experience in rocket propulsion, fire and explosions. Recently he had completed research in hazard analysis. This involved determining whether hazards exist in market products and whether the hazards are significant to cause injury to people. Dahn had conducted analysis of ignition sources.

Through mathematics and tests performed by Dahn, it was his opinion that there was insufficient energy caused by dropping a Huffy gasoline can from five feet to ignite a flammable gasoline-air mixture. He determined this by placing a piece of the Huffy can against a car-

borumdum wheel revolving at 1750 rpm in a flammable mixture environment. No ignition of the mixture occurred. The 1750 rpm represented a speed of 23 feet per second. A can kicked five feet represents a maximum speed of 13 feet per second. The test confirmed the mathematical calculations that a Huffy gasoline can kicked five feet will not generate sufficient energy to ignite a flammable mixture.

Based upon his calculations and tests, Dahn concluded with a reasonable degree of scientific certainty, that a spark could not have ignited the gasoline under the facts as described by Sam Broussard.

Defendant National Can presented, by evidence deposition, the testimony of Michael LoPresti. He and Sam had shared a hospital room at Loyola Hospital when Sam was being treated for his burn injuries. On one occasion Sam told Michael how he got burned. LoPresti testified that Sam told him that he, Sam, had been working on a wood project and that he accidentally dropped a match in or near the gasoline and then there was an explosion.

■■ It is axiomatic that a jury's verdict will not be disturbed on appeal unless it is contrary to the manifest weight of the evidence. For the jury's verdict to be against the manifest weight of the evidence, "it must appear that when viewing all the evidence in a light most favorable to the opponent, conclusions reached by the jury are palpably erroneous and wholly unwarranted." (*Kincl v. Hycel, Inc.* (1977), 56 Ill. App. 3d 772.) Here not only is the verdict against the manifest weight of the evidence, it is wholly without the support of any competent evidence. The trier of fact must, as a matter of law, reject testimony which is physically impossible, or so inherently improbable as to be contrary to the common experience of mankind. (*Old Second National Bank v. Gould* (1979), 75 Ill. App. 3d 839.) It appears that the jury accepted the opinion of plaintiff's witness, Schwartz, and the plaintiff's version of the accident that a spark from the sliding gasoline can ignited the can. However, the physical evidence and the experiments and testimony of experts Dahn and Bambenek demonstrate beyond question that the source of ignition for the fire could not have been a frictional spark from the gasoline can. Thus, some conduct of Sam Broussard, the only person present at the time of the accident, must have provided the source of ignition for the fire. Furthermore, if the allegedly defective condition of a product does no more than furnish a condition by which the injury is made possible and that condition causes any injury by the subsequent act of a person, the two are not concurrent, and the existence of the defective condition is not the proximate cause of one injury. *Barr v. Rivinius, Inc.* (1978), 58 Ill. App. 3d 121.

However, the evidence does not establish that any condition of the gasoline can was unreasonably dangerous. The plaintiff claimed the gasoline can was unstable. Even plaintiff's expert claimed that it was stable on a flat surface. Only when on an incline of 30° or greater does instability become a problem. The record does not indicate that the garage in question was anything but a flat surface. Thus, the alleged instability is irrelevant in the instant case. Second, plaintiff claimed the poly-vent was defective in that it did not have adequate provisions for venting internal pressure and it did not reseal itself once opened, thereby emitting vapors. The poly-vent was not designed for that purpose. It was designed to relieve the vacuum inside the container in order to facilitate the pouring. We find no evidence that the emission of vapor would be significantly less from a spring-seated vent, the alternative design suggested by plaintiff's expert Schwartz. Moreover, just because the design used may not be the safest possible does not mean that it is unreasonably dangerous. (*Hunt v. Blasius* (1978), 74 Ill. 2d 203.) The nature and intended function of a feature, as well as cost, are all factors to be considered in analyzing if a feature is unreasonably dangerous. Here, the poly-vent performed well for its intended purpose. Furthermore, the record demonstrates that Mr. and Mrs. Broussard were both aware that the poly-vent would pop up and emit fumes. They knew it would not reseal itself.

Lastly, the plaintiff claimed the number of threads in the neck and cap was inadequate to insure closure and prevent leakage and that a drop of solder on the threads of the neck of the can debilitated the user's ability to screw the cap on the can. The testimony of Schwartz on these subjects was not credible; he was testifying as an expert on subjects that he was not properly qualified to testify as an expert. This testimony should have never been considered by the jury. By scientific evidence it was demonstrated that the solder drop was a result of the fire and could not, therefore, have been a defect which existed before the accident. As for the number of threads, no credible evidence supports a finding that this was a defect in the cap. More threads would not have created a better sealing of the cap. While the cap may have been difficult to screw on properly all the time, the Broussards were aware of this condition. There is no evidence in the record to show that it could not be closed with proper care. In any event, Mr. Broussard testified that he tightly secured the cap after he used the gasoline can on the evening preceding the accident.

The facts of this case reveal the story of a tragic accident involving a young boy with time on his hands, a closed garage and a

gasoline can. As a result of the accident, the boy sustained burn injuries and will probably be scarred for life. But those facts, tragic as they are, do not mean that a product was defective. Those facts alone do not warrant a judgment against the persons who manufacture, design and distribute the gasoline can involved in the accident. There is no probative evidence in the record to support the claim that the gasoline can possessed defects which made it unreasonably dangerous or that the injuries were proximately caused by any defective condition of the can.

The defendants claim several other counts of error. Notably, they claim reversible error in that several jurors inspected gasoline cans, similar to the subject can, outside the courtroom arena during the course of the trial. While we agree, we find it unnecessary to consider that topic because of our holding herein.

Since the judgment of the circuit court of Will County was based on a verdict for which there is no competent, probative supporting evidence, the judgment must be reversed. Accordingly, judgment is entered for the defendants.

Reversed.

SCOTT, J., concurs.

PRESIDING JUSTICE BARRY, dissenting:

I must dissent for two reasons.

Firstly, I believe the majority is in error in reversing the judgment of the trial court without remandment for a new trial. The majority opinion holds that the court erred in permitting Fred Schwartz to testify for the plaintiff as an expert witness and that without the testimony of Schwartz, there was no probative evidence to support the judgment. To reverse without remanding is to deny plaintiff the opportunity to prove his case without the testimony of Schwartz. The courts of this State have long held:

> "Where, in a jury trial, the trial court commits an error of law pertaining to the admission of evidence which requires a reversal of the judgment, the Appellate Court, upon reversal, must remand for a new trial, unless it appears from the record that the error cannot be obviated upon another trial. *Dixon v. Smith-Wallace Shoe Co.,.,* 283 Ill. 234, 239, 119 N.E. 265; *Abdill v. Abdill,* 292 Ill. 231, 232, 126 N.E. 543; *Frey v. City of Chicago,* 330 Ill. 640, 642, 162 N.E. 139." (*McCottrell v. Benson* (1961), 32 Ill. App. 2d 367, 370, 178 N.E.2d 144, 145.)

Accordingly, if I were to agree that the trial court erred, I would remand for a new trial.

Secondly, I believe Schwartz was more than sufficiently qualified to testify as an expert, and that his testimony was properly admitted. In addition, I disagree with the majority's observation that reversible error occurred when two jurors observed some gasoline cans in a store window. Finally, I have concluded that none of the other errors urged by defendants require reversal of the judgment.

Initially, I would note that Schwartz was extensively examined regarding his professional background before he was allowed to testify as to his expert opinion concerning the issues in this case. Virtually his entire career had been devoted to product development and design responsibilities of containers and equipment involving combustible fuels. He holds numerous patents relating to such containers, and has worked in private industry and with trade organizations in developing standards for storage, refueling, and transporting gasoline in both the aircraft industry and the railroad industry. For the last 12 years he has been self-employed as an engineering consultant, and about 25 to 30 percent of his work has been the investigation of tank car accidents involving fires. All of these elements of Schwartz' background are related to the safe containment of gasoline and other hazardous substances, thereby justifying the trial court's conclusion that his experience qualified him sufficiently to testify as an expert in this case.

The test for the admissibility of expert testimony has been held to be whether "the witnesses offered as experts have peculiar knowledge or experience not common to the world, which renders their opinions founded on such knowledge or experience an aid to the court or jury in determining the question at issue." (*Merchants National Bank v. Elgin, Joliet & Eastern Ry. Co.* (1971), 49 Ill. 2d 118, 121, 273 N.E.2d 809, 811.) I believe Schwartz had such "peculiar knowledge or experience" and was properly permitted to testify. The weight to be given the testimony was, of course, a question for the jury. It has been well stated:

> "The testimony of experts must be judged by the same rules of weight and credibility which are applied to other witnesses, and the weight and value of the testimony largely depends on the foundations of fact and reason upon which the opinions stand."
> *Cannell v. State Farm Fire & Casualty Co.* (1975), 25 Ill. App. 3d 907, 912, 323 N.E.2d 418, 422.

In *Nowakowski v. Hoppe Tire Co.* (1976), 39 Ill. App. 3d 155, 349 N.E.2d 578, a tire mechanic with 18 years experience inspecting and mounting tires was allowed to express an expert opinion as to the

cause of the explosion of a truck tire which blew up while being mounted. The reviewing court found no error and stated:

> "The knowledge required to qualify one as an expert may be obtained from study or experience, or a combination of both [citation], and whether a witness qualifies as an expert is a matter within the sound discretion of the trial court. [Citation.] [The witness] had been employed as a tire mechanic for some 18 years and had inspected and mounted thousands of tires. The trial court reasonably concluded that this extensive experience gave him special knowledge not shared by the average juror." 39 Ill. App. 3d 155, 163, 349 N.E.2d 578, 585-86.

It is undisputed that Schwartz was experienced in product development and design of large containers of gasoline and other hazardous substances. He has had a distinguished career and served in a variety of responsible positions in several companies before becoming self-employed. During the last 12 years he has spent a substantial amount of time investigating accidents involving gasoline explosions and fires. His lack of familiarity with the manufacturing process of two-gallon cans did not affect his qualification in the general field of containment of gasoline in my opinion.

The view of the majority opinion seems to be that an expert can testify only in the narrow area where he has been previously employed, regardless of the relevance of one area of science or trade to another. In other words, the majority says that expertise in designing railroad tank cars and aircraft fuel equipment does not qualify a witness in the field of two-gallon gasoline cans. This ignores the fact that Schwartz possessed extensive expertise about the properties of gasoline and other combustibles, and the fact that the basic principles of safety in handling gasoline are the same whether you are storing 2 gallons or 2,000 gallons. His scientific and technical study and experience alone were, in my view, sufficient to permit him to testify as an expert about the design of gasoline containers of any size—large, small, and in-between. Any special requirements unique to small containers would be factors to be considered by the jury in determining the weight to be given his testimony and would not render his testimony inadmissible.

It should also be noted that, even where it is error to refuse to allow cross-examination of an expert witness as to his qualifications before he begins to testify to expert opinions, such error has been held to be harmless where subsequent extensive cross-examination is allowed. (See *Geving v. Fitzpatrick* (1978), 56 Ill. App. 3d 206, 371 N.E.2d 1228.) The cross-examination in this case was extensive, and

the background and experience of Schwartz was thoroughly examined. Consequently, even if it were error to deny defendants a chance to conduct a *voir dire* examination of Schwartz, such error would have been harmless.

Defendants also assert that reversible error occurred when the jury improperly considered information not in evidence and that such evidence was related to the issue of liability. According to affidavits in the record, two women members of the jury noticed a display of gasoline cans in a store window while walking past the store during a noon recess in the trial. Both women noticed some solder droplets on the tops of the display cans around the necks of the cans, and both noticed that the presence of solder was similar to that on some of the cans admitted into evidence. The observation of the drops of solder on these cans was mentioned by the women during the jury deliberations. In addition, one of the women who saw the display of gasoline cans also purchased a similar can for her own use, at another time, during trial.

The jury verdict was returned on September 25, 1980, and during October and November of 1980, defendants obtained affidavits from four jurors stating that some members of the jury had inspected other gasoline cans for the purpose of determining whether there was solder on the threads of the necks of the cans. Defendants filed these affidavits in this cause. Later, nine of the jurors, including the four who had previously given affidavits, signed more detailed affidavits indicating that the view of cans by two jurors had been accidental, that the jurors had observed solder drops on the tops of the cans rather than on the threads, that these observations were mentioned to the jury but did not affect or influence the decision of the jury. These latter affidavits were submitted to the court by plaintiff in support of the verdict and judgment.

It should be noted that one of the factual issues before the jury was the origin of the drop of solder visible on the threads of the neck of the can which had been involved in the fire. It was agreed by the expert witnesses that the drop of solder would prevent the cap from closing tightly or sealing the can. Plaintiff's theory was that the drop of solder adhered to the threads during the manufacturing process, while defendants insisted that it originated in the fire. Apparently solder will melt during a fire of this type, and defendants theorized that the solder ran along the neck of the can and under the cap along the threads where it solidified. The neck and the handle of the can were separate components also attached by solder to the can during the manufacturing process. During the trial, plaintiff introduced into evi-

dence the can which had been kicked by Sam Broussard. The neck was still attached. Defendants introduced a number of other gasoline cans, several of identical design, manufactured by various companies. All but one such cans of the Type F style have drops of solder clearly visible on the top of the can in the area where the neck is attached.

The trial court ruled that the viewing of cans by the jurors was inadvertent and not for investigatory purposes and that defendants had failed to show the probability of prejudice to them as a result and for those reasons the court denied that part of the defendants post-trial motion alleging jury misconduct or extraneous influence.

I believe the trial court erred to the extent it may have considered the test to be whether the jurors' view of extraneous evidence was inadvertent or not. The purposefulness of the examination of the window display of gas cans is immaterial in view of the affidavits of the two jurors that they did in fact see solder droplets on the tops of the new cans and that they did discuss their observations during the jury deliberations. At first blush, this situation would seem to be the one that would require a reversal since the rule in Illinois is that any extraneous information in the nature of evidence upon an issue in the case brought to the jury's attention is grounds for reversal, and neither the trial court nor the reviewing court should delve into the exact effect of unauthorized evidence upon a particular juror. (*Heaver v. Ward* (1979), 68 Ill. App. 3d 236, 386 N.E.2d 134.) However, it has also been held that it must be apparent that there is such a probability of prejudice resulting that due process would be inherently lacking before reversal is required. (*People v. Mills* (1968), 40 Ill. 2d 4, 237 N.E.2d 697; *People v. Holmes* (1978), 69 Ill. 2d 507, 372 N.E.2d 656; *United States ex rel. Tobe v. Bensinger* (7th Cir. 1974), 492 F.2d 232, 237.) Thus it is appropriate to test the trial court's ruling as to whether viewing the store display of gas cans and noting solder drops thereon could be prejudicial to defendants' case.

Parenthetically it must be stated that the statements of the jurors in their affidavits that they were not influenced by the report of solder drops on other cans cannot properly be considered. One rule is clear: where a juror attempts to prove by affidavit or testimony the motive, method or process by which the jury reached its verdict, the testimony is inadmissible. (*Holmes.*) Thus, we should ignore the improper statements in the affidavits.

What cannot be ignored is that a total of six new F style gasoline cans were introduced into evidence (one by plaintiff and five by defendant Huffy) and all but one have droplets or solder plainly visible on the top where the neck is attached and on the tops generally.

Thus, the observations of the two jurors were plainly cumulative of defendants own evidence as well as that of plaintiff. Furthermore, the fact that the necks were soldered to the tops was not a disputed issue in the case. All parties agreed to that. The factual question confronting the jury was how a drop of solder came to be deposited on the threads of plaintiff's exhibit No. 32 (the can involved in the fire). I do not comprehend how the jurors' view of some additional gasoline cans that possessed the same characteristics as those in evidence could have affected their determination of that question. For that reason, I would agree with the trial court that there was not such a " 'probability that prejudice will result' " (*People v. Holmes* (1978), 69 Ill. 2d 507, 516, 372 N.E.2d 656, 660) as to affect the outcome of this case. Thus, I would find the jurors' view of gasoline cans in a store window to have been harmless.

Another error asserted by defendants involved the testimony of Deputy State Fire Marshall Dwight Elliott who testified on behalf of plaintiff concerning State standards for gasoline containers. Elliott stated that his office had the authority to regulate storage, transportation, and use of gasoline and other flammable liquids and that the Fire Marshall can regulate the sale and dispensing of gasoline containers. Elliott then stated that before a can will be approved for sale and distribution, it must have a spring-loaded closure, a flame-arresting screen, and other requirements of a safety nature. He stated unequivocally that the can in question (plaintiff's exhibit No. 32) had not been approved for sale by the State Fire Marshall, and he further stated that the Fire Marshall has a right to control and enforce the regulations as they apply to retailers. (This evidence was admitted as applying only to defendant Huffman Manufacturing Co., the manufacturer of the can, and not the other defendants.) During the course of this testimony the trial court denied numerous motions to strike and for mistrial as defendant repeatedly asserted that no such regulations had ever been made or published and that the Fire Marshall had no such authority under applicable statutes. The court at one point noted that it might be a question of fact whether such a rule exists and that, if no such rule is produced, he would entertain a motion to strike.

Upon cross-examination Elliott referred only to the rule requiring persons storing gasoline in cellars, basements and pits to use approved safety containers. The phrase "approved safety containers" he said, had been interpreted to mean containers meeting certain UL specifications and was a standardized term.

At the conclusion of Elliott's testimony, no written rule of the

Fire Marshall had been produced, as promised by the plaintiff's counsel, which would have prevented defendant Huffman from lawfully selling its Type F gasoline cans in Illinois. The next day, after Schwartz testified to the meaning of safety type gasoline cans and to his understanding of the State regulations, the trial court ruled that Elliott's testimony should be striken. At a later point in the trial, the court instructed the jury to disregard Elliott's testimony.

On appeal, defendants argue that the testimony was so prejudicial that the error could not be cured by a mere instruction to the jury to disregard.

Defendants have placed in the record a post-trial affidavit by a psychologist stating that he had read the record and that such testimony must have influenced the jury. Plaintiff countered with affidavits by several jurors indicating that they did not discuss or consider Elliott's testimony. All such affidavits are improper and will not be considered by trial courts or reviewing courts in Illinois because they purport to describe the mental process of the jury in reaching its decision. As indicated in *Holmes* and other cases cited above, such affidavits are inadmissible.

The effect of Elliott's testimony in the course of a lengthy trial is a matter for the discretion of the trial court, since the court is in a better position to determine whether a fair trial has been held and whether substantial justice has been done. A reviewing court will reverse on the basis of improperly admitted evidence which was ordered stricken only where there was some great abuse of discretion. (*Fitzsimons v. National Tea Co.* (1961), 29 Ill. App. 2d 306, 173 N.E.2d 534; Hunter, Trial Handbook for Illinois Lawyers sec. 78.3 (4th ed. 1972).) Considering the confusing nature of Elliott's testimony, the length of the trial, and the trial judge's superior position to determine prejudice, I would not say there was clearly "some great abuse of discretion" here. Rather I would join the trial judge and find any error to have been cured by the instruction to disregard Elliott's evidence.

Defendants also contend that other erroneous rulings of the trial court deprived them of a fair trial and require a reversal of the judgment. The rulings claimed to be error are as follows:

1. Allowing Schwartz to express expert opinions on matters of common knowledge, such as the stability of the container, adequacy of threading on the neck, the danger of allowing solder to accumulate on the neck, and the tendency of the can to leak when the cap was not tight. Schwartz discussed these characteristics in terms of design criteria.

2. Refusing to allow Bambenek (defendants' expert engineer) to testify to the cause of the second and third degree burns on plaintiff's arms and neck.

3. Plaintiff's attorney mentioned in closing argument that he would not have been able to present evidence of other claims in response to defendants' argument that millions of these cans have been sold and that plaintiff had no evidence of any other cases. Defendants' objection was sustained.

4. Other instances that occurred where objections were sustained but plaintiff's counsel tried to obtain the same information with reworded questions.

5. Plaintiff's attorney referred to the number of times defendants' expert witnesses had testified in other trials.

6. Plaintiff's counsel argued with the court over rulings.

7. Plaintiff's lawyer cross-examined Bambenek on his past employment by insurance companies to investigate accidents after the witness first mentioned such employment on direct examination.

8. Admitting evidence to impeach witness LoPresti who had been a hospital roommate of plaintiff, and whose evidence deposition was introduced at trial.

In my view, none of these challenged rulings amounted to reversible error, and accordingly, they need not be discussed in this dissenting opinion.

Defendants also assert that the verdict was contrary to the manifest weight of the evidence. This argument is predicated upon the theory that the expert testimony of Schwartz was not probative and should not have been considered, or, in the alternative, that defendants' experts were so much more qualified than plaintiff's expert that defendants' evidence was entitled to more weight. As indicated above, I do not agree with this view of the testimony of Schwartz.

Defendants also argue that the physical evidence indicates the improbability of the accident occurring as plaintiff testified. Whether the can was defective and unreasonably dangerous for its intended use was, it seems to me, clearly a factual issue for the jury to resolve on the basis of the evidence before it. I find the testimony of Schwartz to have been admissible, and I also find that his testimony was sufficient to support a finding that the gasoline can was unreasonably dangerous.

Defendants insist that the uncontroverted evidence established that a spark from friction could not have been the source of ignition.

In doing so, they ignore the fact that one of their own expert witnesses, Robert Bambenek, stated on direct examination that it *was* possible that the fire resulted from plaintiff kicking the can, although in his opinion it could not have happened that way. Furthermore, Bambenek based his opinion upon the fact that the tin-plating on the can was a soft metal that would not spark when rubbed against concrete. He went on to say:

> "On the other hand, if it is kicked a sufficient distance, it is theoretically possible the lead or tin coating could be worn off."

He went on to say that he thought the garage was too cluttered for the can to have been kicked a sufficient distance to create such a spark. The following day, Bambenek was questioned on cross-examination as follows:

> "Q. I believe you did tell me yesterday that, in your opinion, it was possible for a spark to have been the ignition source in this event, is that correct?
>
> A. Theoretically based on energy considerations, it's possible."

Bambenek ruled out an ignition source more than two feet above the can, and specifically eliminated a light switch as a possible cause of a spark. He also stated that a spark from the floor was not a possible source because the gasoline and air mixture would be too rich at floor level. These statements seem to be somewhat at odds with his other statements that a spark from the can or other source was a possibility.

I have examined the can in question, and from the scratched and scraped and rusted condition of the can, I believe the jury could have found that the tin plating was worn off and that the steel caused a spark which ignited the gasoline as it was spilling.

Other evidence must have weighed in plaintiff's favor. For example, several safety-type cans were placed in evidence which had safety features such as greater stability, heavier metal, safety closures, etc. Thus, defendants knew how to produce a safer can. Additionally, defendants' evidence indicated that the F-style can body was also sold to the food industry for salad oil and shortening, and that the twist-on cap was not in fact designed for use on gasoline cans.

Defendants sought to impeach plaintiff's testimony by the deposition of a former hospital roommate who indicated that plaintiff had told him he had dropped a match into the can. On its face, this version of the ignition source contradicts statements of defendants' experts that the cap was on the can during the fire. Furthermore, the possibility that other objects capable of sparking were present on the

garage floor was never ruled out.

I do not find the testimony of defendants' experts so overwhelmingly convincing that a contrary verdict could never stand (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504), and consequently I cannot say that the verdict was wrong as a matter of law, or that it was contrary to the manifest weight of the evidence. In fact, the testimony of defendants' experts explaining how a drop of molten solder *could* run sideways along the neck of the tipped-over can under the cap and solidify on the threads of the neck of the can during the fire seems so improbable as to invite the jury to reject it, given the fact that the soldered neck remained attached.

For the reasons stated, I would affirm the verdict and judgment of the trial court.